**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS**

**NOEL STUERTZ**

*Plaintiff,*

v.

**HORIZON THERAPEUTICS USA, INC., a
Delaware Corporation**

*Defendants.*

**Case No.: 21-CH-00396**

**Hon. Daniel L. Jasica**

**SUMMONS**

To each defendant:

**Horizon Therapeutics USA, Inc.
c/o Illinois Corporation Service C
801 Adlai Stevenson Drive
Springfield, IL 62703**

    You are summoned and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, in the office of the Clerk of this Court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

    E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.

To the officer:

    This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed.

171-138 Rev 07/18

Exhibit A

This summons may not be served later than 30 days after its date.

WITNESS _____ 11/9/2021

*Erin Cartwright Weinstein*
ERIN CARTWRIGHT WEINSTEIN,
Clerk of Court

JS

Prepared by: Robert J. Tomei JR.
Name: Johnston Tomei Lenczycki & Goldberg, LLC    Pro Se ☐
Address: 350 N Milwaukee Avenue, Suite 202
City: Libertyville                    State: IL
Phone: (847) 549-0600          Zip Code: 60048
ARDC #: 6310339
Fax: (847) 589-2263
E-mail address: Rob@LawJTLG.com
(If service by facsimile transmission will be accepted, the telephone number of the plaintiff or
plaintiff's attorney's facsimile machine is additionally required.)

Date of Service _____, 20 _____ (to be inserted by officer on copy left with defendant or other
person).

Exhibit A

SHERIFF'S FEES

( Service and return ............................................. $ _____

( Miles_____  ............................................. $ _____

( Total ................................................. $ _____

_____

Sheriff of _____ County

I certify that I served this summons on defendants as follows:

(a)-(Individual defendants – personal):
(The officer or other person making service, shall (a) identify as to sex, race and approximate age of the defendant with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of the day when the summons was left with the defendant).

_____

_____

_____

_____

(b)-(Individual defendants – abode):
By leaving a copy of the complaint at the usual place of each individual defendant with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons.  (The officer or other person making service, shall (a) identify as to sex, race and approximate age of the person, other than the defendant, with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of day when the summons was left with such person).

_____

_____

_____ and also by sending a copy of the summons and of the complaint in a sealed envelope with postage fully prepaid, addressed to each individual defendant at his usual place of abode, as follows:

| Name of defendant | Mailing Address | Date of mailing |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(c)-(Corporate defendants):
By leaving a copy and a copy of the complaint with the registered agent, officer or agent of each defendant corporation, as follows:

| Defendant corporation Service | Registered agent, officer or agent | Date of |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(d)-(Other service):

_____

_____

_____

_____ Sheriff of _____County

By: _____

(Deputy)

171-138 Rev 07/18

Exhibit A

This summons may not be served later than 30 days after its date.

11/9/2021

WITNESS _____

*Erin Cartwright Weinstein*

ERIN CARTWRIGHT WEINSTEIN,
Clerk of Court

JS

Prepared by: Robert J. Tomei JR.

Name: <u>Johnston Tomei Lenczycki & Goldberg, LLC</u>   Pro Se ☐

Address: <u>350 N Milwaukee Avenue, Suite 202</u>

City: <u>Libertyville</u>                State:  <u>IL</u>

Phone: <u>(847) 549-0600</u>        Zip Code: <u>60048</u>

ARDC #: <u>6310339</u>

Fax:  <u>(847) 589-2263</u>

E-mail address: <u>Rob@LawJTLG.com</u>

(If service by facsimile transmission will be accepted, the telephone number of the plaintiff or plaintiff's attorney's facsimile machine is additionally required.)

Date of Service _____, 20 _____ (to be inserted by officer on copy left with defendant or other person).

171-138 Rev 07/18

Exhibit A

SHERIFF'S FEES

( Service and return ............................................... $ _____

(

( Miles_____ ............................................... $ _____

(

( Total ............................................... $ _____

_____

Sheriff of _____ County

I certify that I served this summons on defendants as follows:

(a)-(Individual defendants – personal):

(The officer or other person making service, shall (a) identify as to sex, race and approximate age of the defendant with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of the day when the summons was left with the defendant).

_____

_____

_____

_____

(b)-(Individual defendants – abode):

By leaving a copy of the complaint at the usual place of each individual defendant with a person of his family, of the age of 13 years or upwards, informing that person of the contents of the summons. (The officer or other person making service, shall (a) identify as to sex, race and approximate age of the person, other than the defendant, with whom he left the summons, and (b) state the place where (whenever possible in terms of an exact street address) and the date and time of day when the summons was left with such person).

_____

_____

_____

and also by sending a copy of the summons and of the complaint in a sealed envelope with postage fully prepaid, addressed to each individual defendant at his usual place of abode, as follows:

| Name of defendant | Mailing Address | Date of mailing |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(c)-(Corporate defendants):

By leaving a copy and a copy of the complaint with the registered agent, officer or agent of each defendant corporation, as follows:

| Defendant corporation Service | Registered agent, officer or agent | Date of |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

(d)-(Other service):

_____

_____

_____

_____ Sheriff of _____County

By: _____

(Deputy)

171-138 Rev 07/18

Exhibit A

**FILED**
**11/10/2021 12:01 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

IN THE CIRCUIT COURT OF THE 19ᵀᴴ JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

NOEL STUERTZ

        *Plaintiff,*

  v.

HORIZON THERAPEUTICS USA, Inc. a
Delaware Corporation.

        *Defendants.*

Case No.: 2021-CH-00396

Hon Judge Daniel L. Jasica

## NOTICE OF *EMERGENCY* MOTION

TO:   *See Certificate of Service*

    PLEASE TAKE NOTICE that on November 12, 2021 at 9:00 a.m., or as soon thereafter as I may be heard, I shall appear in Courtroom C-302 of the Lake County Courthouse, 18 N County St., Waukegan, IL 60085, and then and there present **Plaintff's EMERGENCY Motion for Temporary Restraining Order and Preliminary Injunction,** a copy of which is hereby served upon you.

**Parties wishing to attend the presentment of this motion may appear in person in the courtroom, or may attend remotely. This proceeding will be conducted by Zoom video and telephone conferencing. Login credentials for the Zoom videoconferecing hearing can be found on the court's website at:** https://www.19thcircuitcourt.state.il.us/2187/Daily-Remote-Court-Session-Schedule-C302

              Respectfully Submitted,
              **NOEL STUERTZ**
              By: */s/ Robert J. Tomei Jr.*
              Attorney for Plaintiff

## CERTIFICATE OF SERVICE

    The undersigned does hereby state that a true and accurate copy of this **Notice of Motion and Attached Motion to Reconsider** was served upon the below named at the following address as specified below pursuant to Illinois Supreme Court Rule 11:

         **Via Electronic Mail – November 9, 2021**
             Mr. Thomas E. Deer, ESQ

Exhibit A

Ogletre, Deakins, Nash Smoak & Stewart
155 North Wacker Drive, Suite 4300
Chicago, IL 60606
Email: thomas.deer@ogletree.com

**Via Personal Service – On or before November 10, 2021**
Mr. Tim Walbert
Chairman, President and Chief Executive Officer
Horizon Therapeutics USA, Inc.
1 Horizon Way
Deerfield, IL 60015

Robert J. Tomei Jr.                     Respectfully Submitted,
IL Bar No.: 6310339                     **NOEL STUERTZ**
JOHNSTON TOMEI                          By: _/s/ Robert J. Tomei Jr._
LENCZYCKI & GOLDBERG, LLC               Attorney for Plaintiff
350 N Milwaukee Ave., Ste. 202
Libertyville, IL 60048
P: (847) 549-0600;
F: (847) 589-2263
E: Rob@LawJTLG.com

Exhibit A

**FILED**
**11/9/2021 11:10 AM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS
19th JUDICIAL CIRCUIT COURT

| | |
|---|---|
| **NOEL STUERTZ** | |
|     **Plaintiff,** | |
| **v.** | **Case No. 21-CH-00396** |
| **HORIZON THERAPEUTICS USA, Inc. a Delaware Corporation.** | **Hon. Daniel. L. Jasica** |
|     **Defendant.** | |

## EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO ENJOIN RESPONDENT TAKING ANY FURTHER ADVERSE EMPLOYMENT ACTION

NOW COMES the Plaintiff, NOEL STUERTZ (hereinafter 'Plaintiff" or "STUERTZ"), by and through her Attorney, Robert J. Tomei Jr. and the Law Firm of JOHNSTON TOMEI LENCZYCKI & GOLDBERG, LLC, for her Emergency Motion for Temporary Restraining Order and Preliminary Injunction against Defendant HORIZON THERAPEUTICS USA, Inc., to enjoin HORIZON from taking any further adverse employment action against Plaintiff and to put the parties back into the *status quo antebellum* prior to the initial adverse employment action, states and alleges as follows:

### INTRODUCTION

1.      On or about November 5, 2021, Plaintiff filed the instant action under state and federal law in response to Defendant's Mandatory COVID-19 Vaccination Policy alleging violations of the Illinois Health Care Right of Conscience Act, 745 ILCS 70 *et seq.,* the federal Emergency Use Authorization Act, 21 U.S.C. § 360bbb-3, *et seq.* and Title VII of the Civil Rights Act of 1964 for religious based discrimination and failure to accommodate or engage in the interactive process. A true and correct copy of the file stamped complaint, including all exhibits, is attached hereto as **Exhibit A**.

Exhibit A

2.  The Plaintiff, NOEL STUERTZ, was at all times relevant to this action, a Lake County resident, and in the employ of Defendant HORIZON THERAPEUTICS USA, Inc., on unpaid leave since October 15, 2021, as Director of Market Research, who submitted a timely, signed, written request for a religious exemption and accommodation from Defendant HORIZON's Mandatory COVID-19 Vaccination Policy, but HORIZON has refused to provide a reasonable accommodation. Plaintiff is unmarried and is thusly, solely responsible for her own financial condition. Plaintiff depends on her employment with HORIZON to pay for her food, utilities, home, health insurance and other basic necessities. A continuation of Plaintiff's unpaid leave status or the *imminent* permanent termination of employment, set to go into effect on **November 15, 2021**, because of her religious beliefs will not only be financially devastating to Plaintiff, but will also be mentally, emotionally, and physically devastating also as she becomes deprived of her employee benefits, including health insurance and, ultimately, her way of life. Plaintiff has filed claims with the Illinois Department of Human Rights ("IDHR") with claims contemporaneously filed (by IDHR) with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has been granted formal written "opt-out" and "right to sue" notices from both the IDHR and EEOC. *See* **Exh. A**. at **Exh. 5**; **Exh. 6**.

3.  That the verified facts and corresponding exhibits of her November 5, 2021, Verified Complaint set forth in detail the nature and scope of the Plaintiff's dispute at pages 4-10. *See* **Exh. A** at ¶¶ 11-32.

## LEGAL STANDARD

4.  The function of a preliminary injunction is not merely to contain ongoing damage but to prevent prospective damage. *County of DuPage v. Gavrilos*, 359 Ill. App. 3d 629, 638 (2d Dist. 2005). Under Illinois law, it is generally proper to issue a preliminary injunction that will

Exhibit A

preserve the status quo of the parties rather than alter it. *People v. Van Tran Electric Corp.*, 152 Ill. App. 3d 175, 183, 503 N.E.2d 1179, 105 Ill. Dec. 173 (1987). The status quo is defined as the last actual, peaceable, uncontested status which preceded a pending controversy. *Steel City Bank v. Village of Orland Hills*, 224 Ill. App. 3d 412, 417, *quoting Martin v. Eggert*, 174 Ill. App. 3d 71, 77 (1988). Often preserving the status quo is done by keeping all actions at rest, but sometimes the status quo is not a condition of rest but, rather, is one of action and the condition of rest is exactly what will inflict the irreparable harm. *Brooks v. La Salle National Bank*, 11 Ill. App. 3d 791, 799, 298 N.E.2d 262 (1973). Thus, in certain circumstances, altering the status quo might be appropriate. *See Keystone Chevrolet Co. v. Kirk*, 69 Ill. 2d 483, 486 (1978).

5.      When notice of a request for a temporary restraining order is provided to the other parties, the legal standards for the issuance of a temporary restraining order and the entry of a preliminary injunction are essentially identical. In either instance, the party seeking injunctive relief must establish four elements: (1) a clearly ascertainable right that is in need of protection; (2) a likelihood of success on the merits; (3) irreparable harm if the injunctive relief is not granted; and (4) no adequate remedy at law. *See Travelport LP v. American Airlines, Inc.*, 2011 IL App (1st) 111761, ¶ 33; *County of DuPage v. Gavrilos*, 359 Ill. App. 3d 629, 634 (2d Dist. 2005).

6.      A movant need only establish that there be a "fair question" concerning the existence of claimed rights and a fair question that he will be entitled to the relief prayed for if proof sustains the allegations in order to satisfy the "likelihood of success on the merits" requirement. *Stocker Hing Mfg. Co. v. Darnel Indus., Inc.* 94 Ill. 2d 535, 541-542 (1983). A trial court may issue a TRO based upon specific facts shown in the affidavits accompanying the petition or in a verified complaint on file. *See Gavrilos*, 359 Ill. App. at 635. As to the "irreparable harm" and "no adequate remedy" factors, the potential injury need not be an injury beyond repair –harm

Exhibit A

of a continuing nature is sufficient to warrant injunctive relief. *Greenspan v. Mesirow*, 138 Ill.
App. 3d 294, 300 (1st Dist. 1985).

## ARGUMENT

7.      The Plaintiff has a clear, unambiguous, and ascertainable right to not be
discriminated against for her closely held and sincere religious beliefs or to be subjected to
experimental medical intervention in contravention of federal law as a condition of employment.

8.      The Defendant HORIZON's Mandatory COVID-19 Vaccination Policy, which has
resulted in Plaintiff going on unpaid leave since October 15, 2021 and will result in permanent
termination on November 15, 2021, on its face and as applied, impermissibly burdens Plaintiff's
sincerely held religious beliefs, compels her to change those beliefs or act in contradiction to them,
and forces her to choose between the teachings and requirements of her sincerely held religious
beliefs in the commands of Scripture and the Defendant's imposed value system.

9.      The Defendant HORIZON's Mandatory COVID-19 Vaccination Policy, on its face
and as applied, specifically targets Plaintiff's religious beliefs for disparate and discriminatory
treatment in violation of the Illinois Health Care Right of Conscience Act 745 ILCS 70 *et seq*
("IHCRCA") The statute is clear: it is unlawful for any private institution, such as the Defendant
HORIZON herein, to discriminate against any person on account of a person's conscientious
refusal to obtain or accept health care services contrary to his or her conscience. *See* 745 ILCS
70/5. The IHCRCA defines "conscience" as "a sincerely held set of moral convictions arising from
belief in or relation to God." 745 ILCS 70/3(e). The Act defines "health care" to include any
"patient care", "phase of patient care" "medication" and/or "other care or treatment rendered by a
physician, nurses, paraprofessionals or health care facility, intended for the physical, emotional
and mental well-being of a person." 745 ILCS 70/3(a). The principle of statutory construction

Exhibit A

requires that courts give effect to the legislature's intent by assigning the "plain and ordinary meaning of the language used in the statute [which] is the most reliable indication of that intent." *Rojos v. Martell*, 2020 IL App. (2d) 190215, ¶ 20. When the statutory language is plain and unambiguous, the statute must be applied without exceptions, limitations, or conditions or with resort to other aids of statutory construction. *Id*. By threatening to and actually engaging in adverse employment action against the Plaintiff for refusing to comply with its Mandatory COVID-19 Vaccination Policy, HORIZON has unlawfully discriminated against the Plaintiff on account of her sincerely held religious objections to receiving or accepting one of the available COVID-19 vaccinations that are available in violation of 745 ILCS 70/5. The IHCRA is a superseding statute that overrides any conflicting Acts or parts of acts inconsistent with the IHCRA. 745 ILCS 70/14. Lastly, the IHCRCA does not provide Defendant with any defense to discriminate against Plaintiff based on so-called "undue hardship." *See Rojas*, 2020 IL App. at ¶43.

10.     The Defendant HORIZON's Mandatory COVID-19 Vaccination Policy, on its face, and as applied, in the specific targeting of Plaintiff's religious beliefs for disparate and discriminatory treatment is also violative of Title VII of the Civil Rights Act 42 U.S.C. §2000e *et seq*.  Specifically, the Defendant has refused to engage in the interactive process with Plaintiff regarding her religious accommodations from the Mandatory COVID-19 Vaccination Policy, and instead only responded that it would constitute an undue burden on Defendant HORIZON to offer any accommodations, even in light of the fact that Plaintiff works 100% remotely. Irrespective of the interactive process, Defendant failed to provide Plaintiff with reasonable accommodations for her religious beliefs. Specifically, the Defendant has failed to make any accommodations provided the nature of Plaintiff's employment, in that the tasks can all be completed remotely, as they have been for nearly two years, and in the event in person meetings are absolutely imperative, a negative

Exhibit A

test result (a commonplace exception to mandatory vaccination) could be required, and Plaintiff would gladly comply. Simply put, indefinite leave or termination is not a reasonable accommodation—rather they are adverse employment actions.

11.     The Emergency Use Authorization Act of the United States Code provides, the right of the Secretary of the Department of Health and Human Services to grant "emergency use authorization" for a drug not yet having received full approval from the Food and Drug Administration, and expressly states that for any individual for whom a product being administered the right to accept or refuse administration of the product. *See* 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III). Since all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the Emergency Use Authorization Act,[1] the Plaintiff must be given the right to accept or refuse administration of the product. By imposing a mandatory vaccination policy on Plaintiff and refusing to grant her requests for religious exemption/accommodation from such mandatory policies, Defendant is denying Plaintiff her right to accept or refuse administration of the three currently available COVID-19 vaccinations which are subject only to Emergency use approval under the EUAA and is thusly, violating the EUA.

12.     Thus, by denying Plaintiff her requested religious exemption and reasonable accommodation, Defendant HORIZON is denying Plaintiff her statutory rights under Illinois Law as well as the United States Code by infringing upon the explicit protections outlined in the Illinois Health Care Right of Conscience Act, Title VII of the Civil Rights Act of 1964, as well as the Emergency Use Authorization statute.

---

[1] Plaintiff discusses this at length in her *Verified Complaint* at ¶¶ 72-82. Included in the discussion are two FDA letters issued on August 23, 2021, discussing Emergency Use Authorization to the original Pfizer "BioNTech" COVID-19 inoculation and confirmation that the "COMIRNATY" (FDA approved vaccination) was scientifically and legally distinct from the BioNTech vaccination, and, most notably, was not available as the only available shots in the market are those granted EUA for the BioNTech COVID-19 inoculation.

Exhibit A

13.     Defendant HORIZON'S Mandatory COVID-19 Vaccination Policy has caused, is causing, and will continue to cause Plaintiff immediate and irreparable harm by denying her statutory rights not to be discriminated against for religious based conscientious objection to the administration of medicine and to accept or refuse administration of the three Emergency Use approved COVID-19 vaccinations.

14.     Plaintiff has no adequate remedy at law to prevent the ongoing deprivation of her rights as follows: (1) not to be discriminated against for her closely held and sincere religious beliefs under both the Illinois Health Care Right of Conscience Act and Title VII of the Civil Rights Act of 1964, and (2) her right to be given the option to accept or refuse administration of the emergency use authorized COVID-19 vaccines currently available.

15.     Absent the entry of a Preliminary Injunction and Temporary Restraining Order, HORIZON's deprivation of Plaintiff's rights will cause her to continue suffering adverse employment action from HORIZON as each day the Plaintiff is on unpaid leave (or is permanently terminated) is and will continue causing a loss which cannot be recovered.

WHEREFORE, Plaintiff respectfully prays from this Honorable Court an order granting the following relief:

A. That the Court issue a Temporary Restraining Order restraining and enjoining HORIZON, all its officers, agents, employees, and attorneys, and all other persons in active concert or participating with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with HORIZON's mandatory vaccination policy or any other written or unwritten policy or practice denying Plaintiff her right to accept or refuse administration of the COVID-19 vaccines under the Emergency Use Authorization statute, or subjecting Plaintiff to discrimination for the exercise of her sincerely held religious

Exhibit A

beliefs against administration of the COVID-19 vaccines in violation of the Illinois Health Care Right of Conscience Act or Title VII of the Civil Rights Act of 1964.

B. That the Court issue a Preliminary Injunction pending trial, and a Permanent Injunction upon judgment, restraining and enjoining HORIZON, all its officers, agents, employees, and attorneys, and all other persons in active concert or participating with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with HORIZON's mandatory vaccination policy or any other written or unwritten policy or practice denying Plaintiff her right to accept or refuse administration of the COVID-19 vaccines under the Emergency Use Authorization statute, or subjecting Plaintiff to discrimination for the exercise of her sincerely held religious beliefs against administration of the COVID-19 vaccines in violation of the Illinois Health Care Right of Conscience Act or Title VII of the Civil Rights Act of 1964.

C. That this Court render a Declaratory Judgment declaring that HORIZON's Mandatory COVID-19 Vaccination Policy, both on its face and as applied by HORIZON, is illegal and unlawful under the Emergency Use Authorization statute, 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), the Illinois Health Care right of Conscience Act, 745 ILCS 70/5 and 745 ILS 70/7, and Title VII, 42 U.S.C. §2000e, *et seq.*, and further declaring that:

    a. By placing Plaintiff on unpaid leave or terminating Plaintiff from employment with HORIZON or by threatening to so terminate or remove Plaintiff from her current position, HORIZON has unlawfully denied Plaintiff her statutory rights under the Emergency Use Authorization statute to refuse administration of a product granted only Emergency Use Authorization; and

    b. By placing Plaintiff on unpaid leave or terminating Plaintiff from employment with

Exhibit A

HORIZON, or by threatening to so terminate or remove Plaintiff from her current position, HORIZON has unlawfully discriminated against Plaintiff on account of her sincerely held religious beliefs to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5 AND 745 ILCS 70/7 and Title VII of the Civil Rights Act of 1964.

D. That this Court enter an award of damages to Plaintiff in an amount to be proven at trial (but not less than $2,500 per violation, as provided by 745 ILC 70/12), and treble damages as provided by 745 ILCS 70/12, including those for pain and suffering, that Plaintiff sustained as a result of HORIZON's discriminatory, unconscionable, and unlawful Mandatory COVID-19 Vaccination Policy.

E. That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of a final judgment.

F. That this Court retain jurisdiction over the matter for purposes of enforcing the Court's order.

G. That this Court award Plaintiff her reasonable attorney's fees, costs, and expenses of this action, as required by 745 ILCS 70/12 and Title VII.

H. That the Court grant such other and further relief as is just and proper.

Robert J. Tomei Jr.
IL Bar No.: 6310339
JOHNSTON TOMEI
LENCZYCKI & GOLDBERG, LLC
350 N Milwaukee Ave., Ste. 202
Libertyville, IL 60048
P: (847) 549-0600;
F: (847) 589-2263
E: Rob@LawJTLG.com

Respectfully Submitted,
Plaintiff Noel Stuertz
By: /s/ *Robert J. Tomei Jr.*
Attorney for Plaintiff

Exhibit A

## VERIFICATION

Under penalties as provided by law pursuant to 735 ILCS 5/1-109 of the Code of Civil Procedure, the undersigned certify that the statements set forth in the instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certify as aforesaid that they verily believe the same to be true.

Noel Stuertz

Exhibit A  –

**FILED**
**11/5/2021 7:56 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

IN THE CIRCUIT COURT OF LAKE COUNTY, ILLINOIS
19th JUDICIAL CIRCUIT COURT

NOEL STUERTZ

      Plaintiff,

v.

HORIZON THERAPEUTICS USA, Inc. a Delaware
Corporation.

      Defendant.

Case No. 21CH00000396

## *Verified* COMPLAINT *at* LAW

NOW COMES the Plaintiff, NOEL STUERTZ (hereinafter 'Plaintiff" or "STUERTZ"),
by and through her Attorney, Robert J. Tomei Jr. and the Law Firm of JOHNSTON TOMEI
LENCZYCKI & GOLDBERG, LLC, for her Verified Complaint, complaining against
Defendant HORIZON THERAPEUTICS, states and alleges as follows:

### PRELIMINARY STATEMENT

*"Unless we put medical freedoms into the Constitution, the time will come when*
*medicine will organize into an undercover dictatorship to restrict the art of healing to one*
*class of Men and deny equal privileges to others; the Constitution of this Republic should*
*make special privileges for medical freedom as well as religious freedom."* Dr. Benjamin Rush[1]

### NATURE *of the* ACTION

1.    That Plaintiff brings this action under state and federal law in response to
Defendant HORIZON's Mandatory COVID-19 Vaccination Policy and its violations of the
Illinois Health Care Right of Conscience Act, 745 ILCS 70 *et seq* and the federal Emergency
Use Authorization Act, 21 U.S.C. §360bbb-3, *et seq.*

---

[1] Dr. Benjamin Rush served as the Surgeon General of the Continental Army during the and most notably, a
signatory of the Declaration of Independence.

1

Exhibit A

2.      That Plaintiff further brings this action under federal law in response to Defendant HORIZON's Mandatory COVID-19 Vaccination Policy and its violations of Title VII of the Civil Rights Act of 1964 for religious based discrimination and failure to accommodate or engage in the interactive process.

## JURISDICTION *and* VENUE

3.      That subject matter jurisdiction is conferred upon this Court pursuant to Ill. Const. 1970, Art. VI, §9, as the action arises under the laws of the State of Illinois and United States of America.

4.      That venue is proper in this Court because Defendant HORIZON THERAPEUTICS USA, Inc. transactions business, including having its principal place of business operation located in this district, and all or substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Lake County, Illinois.

5.      That this Court is authorized to grant Plaintiff's prayer for temporary restraining order and preliminary and permanent injunctive relief pursuant to 735 ILCS 5/11-101 of the Illinois Code of Civil Procedure.

6.      That this Court is authorized to grant Plaintiff's prayer for relief regarding equitable relief and monetary damages pursuant to the laws of the State of Illinois.

7.      That this Court is authorized to grant Plaintiff's prayer for relief regarding damages, including treble damages, under the Illinois Health Care Right of Conscience Act, 745 ILCS 70/12.

8.      That this Court is authorized to grant Plaintiff's prayer for relief regarding costs and expenses, including reasonable attorneys' fees, pursuant to the Illinois Health Care Right of Conscience Act, 745 ILCS 70/12.

2

Exhibit A

## THE PARTIES

9.      That Plaintiff, NOEL STUERTZ, was at all times relevant to this Complaint, an individual residing in Lake County, Illinois and she is accordingly an Illinois resident and a citizen of the United States. Plaintiff is currently in the employ, on unpaid leave, of Defendant HORIZON THERAPEUTICS USA, Inc. as Director of Market Research who submitted a signed, written request for a religious exemption and accommodation from Defendant HORIZON's Mandatory COVID-19 Vaccination Policy, but HORIZON has refused to provide a reasonable accommodation. Plaintiff is unmarried and is thusly solely responsible for her own financial condition. Plaintiff depends on her employment with HORIZON to pay for her food, utilities, home, health insurance and other basic necessities. A continuation of Plaintiffs unpaid leave status or the *imminent* permanent termination of employment because of her religious beliefs will not only be financially devastating to Plaintiff, but will also be mentally, emotionally, and physical devastating as well as she becomes deprived of her employee benefits, including health insurance and her way of life. Plaintiff has filed claims with the Illinois Department of Human Rights (contemporaneously filed with the Equal Employment Opportunity Commission) accompanied by a request to opt-out from the administrative investigation process so that Plaintiff could be issued a "right to sue" notice and file this action immediately.

10.     That Defendant, HORIZON THERAPEUTICS USA, Inc, is a Delaware Corporation with its principal place of business at 1 Horizon Way, Deerfield, Illinois. HORIZON operates and conducts business in Illinois. HORIZON's registered agent can be found at Illinois Corporation Service C, 801 Adlai Stevenson Dr., Springfield, IL 62703.

## STATEMENT *of* FACTS

3

Exhibit A

11.     That Plaintiff was initially hired for full time employment by Defendant HORIZON THERAPEUTICS USA, Inc. on or about April 1, 2019, as a *leader* in the market research function prior to and throughout the successful launch of the Thyroid Eye Disease therapeutic known as "TEPEZZA."

12.     That during the time Plaintiff has been in the employ of Defendant HORIZON, Plaintiff has been, according to the Defendant's Executive Director of Market Research, Colleen Foley, a "significant contributor to the market research and ophthalmology teams."

13.     That in fact, and in response to Plaintiff's continued stellar contributions to the Defendant HORIZON, on or about November 16, 2020, Plaintiff was promoted to position of Director of Market Research of Defendant HORIZON THERAPEUTICS USA, Inc.

14.     That during the time in which Plaintiff served as the Director of Market Research, and prior to her official capacity in that role, whether working remotely or on site, Plaintiff met all of her individual and company milestones, as set by HORIZON Management and the HORIZON Board of Directors

15.     That at all times relevant to this action, Plaintiffs primary role consisted of planning and execution of all market research for the ophthalmology business unit which was comprised of three full time employees and one contractor reporting directly to the Plaintiff. Plaintiff reported directly to the executive directive director of market research.

16.     That on or around March 16, 2020, at the direction of HORIZON, and in response to the ongoing public health crises caused by the COVID-19 pandemic, Plaintiff was asked to begin working remotely from home.

17.     That on or around August 10, 2021, Defendant HORIZON introduced a new policy mandating that any employee, notwithstanding workplace arrangements for employees

Exhibit A

primarily working remotely, religious beliefs, or otherwise, would be required, to be "fully vaccinated against COVID-19 from one of the three available COVID-19 Emergency Use Authorization inoculations being offered to the public." *See* **Exhibit 1**, August 10, 2021, (updated August 30, 2021) COVID-19 Vaccine Policy.

18. That the Defendant's Mandatory COVID-19 Vaccination Policy provides, in the Frequently Asked Questions section, the following pertinent information:

> **9. I work remotely. Do I need to be vaccinated? Yes. The COVID-19 vaccination will be a condition of employment at Horizon, regardless of where you work. Many remote employees visit health care facilities and vaccination will ensure the safety of all Horizon's employees and their availability for onsite work, if required. Full vaccination is required by October 15, 2021.**
>
> ...
>
> **17. NEW: Why can't employees submit to regular testing instead of vaccination requirement? Horizon believes the most effective way to protect employees against COVID-19 is the vaccine. The evidence is clear, and we believe in the science. As a leading health care company, we have a duty to ensure the safety of our employees as well as the patients and physicians we serve. We also must protect the most vulnerable members of the communities where we live and work. For the reasons, our leadership team has unanimously determined that requiring all Horizon employees to be vaccinated is the right thing to do in line with our highest corporate values.**
>
> ...
>
> **22. Can Horizon "force" me to get vaccinated if I don't share the same views as leadership regarding the safety or need for the COVID-19 vaccination? We have no intention of forcing anyone to do anything that they are opposed to. If you do not want to get vaccinated, it is ultimately your choice. However, getting vaccinated is a condition of employment. It is not an option to choose not to get vaccinated and to continue to be employed by Horizon.**
>
> ...
>
> **34. How do I apply for an exemption to the COVID-19 vaccine policy, and what is the deadline? Medical and religious requests must be submitted prior to September 10, 2021.**

5

Exhibit A

. . .

**Religious Exemption**
**Exemptions to the mandatory COVID-19 vaccination requirement may also be granted if vaccination conflicts with the tenets of a sincerely held religious belief. Individuals requesting an exemption because of sincerely held religious beliefs should obtain clarification from their religious leader (or other person who can attest the individual's religious beliefs are sincerely held) and submit a request for accommodation to the HRNow Engagement Center by calling 833.496.4769 or email your request to HR@horizontherapeutics.com**

*See* Exh. 1.

19.     That Plaintiff is of devout Christian of Evangelical-Lutheran denomination and has been throughout her life, including during her tenure in Defendant's employ.

20.     That based on Plaintiff's deeply held religious beliefs from Christian biblical worldview, Plaintiff cannot in good faith consent to receiving any of the different iterations of the COVID-19 vaccination because they contain or were tested using, cell lines form aborted fetal tissue. Among other specific scripture, as it says in Psalm 139:13: *"For you created my inmost being. You knit me together in my mother's womb."* According to Scripture, human life, from conception to the moment God calls us home to heaven, is extremely sacred. Plaintiff could not reconcile with herself the thought of injecting something originating from aborted human fetal tissue as it dishonors the lives of the unborn as well as the word of Scripture.

21.     That on September 8, 2021, Plaintiff caused to be delivered a letter to the HORIZON Department of Human Resources, accompanied by a letter drafted by my Pastor, Rev. Steven J. Cornwell, outlining her closely held religious beliefs requesting that Defendant consider her for a religious based accommodation or exemption from the new policy. *See* **Exhibit 2**, Stuertz Sept. 8, 2021, Religious Exemption Letter; *see* **Exhibit 3**, Rev. Steven J. Cornwell Letter.

6

Exhibit A

22.    That as set forth in her September 8, 2021, religious exemption accommodation letter, Plaintiff's sincerely held religious convictions stem from the belief that  God forms children in the womb and knows them prior to birth, and that because of this, life is sacred from the moment of conception to natural death. *See Psalm* 139:13-14. ("For You formed my inward parts; you knitted me together in my mother's womb. I praise you, for I am fearfully and wonderfully made."); *Psalm* 139:16 ("Your eyes saw my unformed substance; in your book were written, every one of them, the days that were formed for me, when as yet there was none of them."); *Isaiah* 44:2 ("Thus says the LORD who made you, who formed you from the womb…"); *Isaiah* 44:24 ("Thus says the LORD, your Redeemer, who formed you from the womb: 'I am the LORD who made all things . . ."); *Isaiah* 49:1b ("The LORD called me from the womb, form the body of my mother he named my name."); *Isaiah* 49:5 ("And now the LORD says, he who formed me from the womb to be his servant . . ."); *Jeremiah* 1:5 ("Before I formed you in the womb I knew you, and before you were born I consecrated you: I appointed you a prophet to the nations.").

23.    That Plaintiff also has sincerely held religious beliefs that every child's life is sacred because each is made in the image of God. *See Genesis* 1:26-27 ("Then God said, 'Let us make man in our image, after our likeness . . . So God created man in his own image, in the image of God he created him; male and female he created them.'").

24.    That Plaintiff has sincerely held religious belief that because life is sacred from the moment of conception, the killing of that innocent life is the murder of an innocent human in violation of Scripture. *See e.g., Exodus* 20:13 ("You shall not murder."). *Exodus* 21:22-23 (imposing death penalty for killing of an unborn child); *Exodus* 23:7 ("[D]o not kill the innocent and righteous…"); *Genesis* 9:6 ("Whoever sheds the blood of man, by man shall his blood be

7

Exhibit A

shed, for God made man in his own image."). *Deuteronomy* 27:25 ("Cursed be anyone who takes a bribe to shed innocent blood.")' *Proverbs* 6:16-17 ("There are six things that the LORD hates, seven that are in abomination to him: . . . hands that shed innocent blood . . .").

25.     That Plaintiff also has sincerely held religious belief that it would be better to tie millstones around her neck and be drowned in the sea than to bring harm to an innocent child. *See Matthew* 18:6; *Luke* 17:2.

26.     That Plaintiff sincerely believes that abortion is the modern-day sacrifice of children made in the image of God. Plaintiff does not wish to be indirectly or directly in any way associated with abortion. To do so is abhorrent, loathsome, detestable, abominable to God. In short, to require Plaintiff to inject a substance into her body that has any association (no matter how near or remote to abortion) is a sin against her Creator, her Lord and her Savior.

27.     That on September 21, 2021, an employee from the Department of Human Resources Accommodation Review Committee, sent via electronic mail, notification to Plaintiff that though her religious beliefs may in fact "be valid and sincere and preclude [her] from taking the vaccine", that fact would not preclude her requirement to take a COVID-19 vaccine to remain employed by Defendant because there "is no sufficiently safe and acceptable accommodation or alternative based on your position and role with the Company." *See* **Exhibit 4**, September 21, 2021, Horizon HR Email.

28.     That HORIZON stated that Plaintiff's request for a religious exemption to the COVID-19 vaccination requirement had been denied because granting the exemption would impose undue hardship on the Defendant, including increased administrative burdens and costs, and safety risks to other employees.

29.     That Defendant HORIZON maintains no expectation that even if Plaintiff were to

Exhibit A

be vaccinated against COVID-19, that she appears in office in order to discharge her duties as the Horizon Director of Market Research. HORIZON has represented to the Plaintiff that the need for Plaintiff to be administered a COVID-19 vaccine, even as a 100% remote employee, is because of the *possibility* (notwithstanding the fact that no such anticipated meetings were identified by Defendant's representative) that someone wishes to conduct an in person meeting at Defendant Horizon's facilities with the Plaintiff.

30.    That Plaintiff's sincerely held religious beliefs, that the Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that she follow his teachings, preclude her from accepting any one of the three currently available COVID-19 vaccines.

31.    That Plaintiff has communicated, in no uncertain terms, that she is ready, willing and able to comply with safe and tested alternatives to universal vaccination as accommodation of her sincerely held religious beliefs, including participating in any office meetings via videoconferencing and if an in-person meeting is absolutely unavoidable, providing proof that she has tested negative for COVID-19.

32.    That the accommodations which have been ongoing for nearly two years are certainly reasonable under the accumulating scientific evidence. Indeed,

> **A preliminary study has shown that in the case of a breakthrough infection, the Delta variant is able to grow in the noses of vaccinated people <u>to the same degree as if they were not vaccinated at all.</u> The virus that grows is just as infectious as that in unvaccinated people, meaning vaccinated people can transmit the virus and infect others.**

Sanjay Mishra, Evidence mounts that people with breakthrough infections can spread Delta easily, National Geographic (Aug. 20, 2021), https://www.nationalgeographic.com/science/article/evidence-mounts-that-people-with-breakthrough-infections-can-spread-delta-easily (**emphasis added**); see also Statement from

Exhibit A

CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR (July 30, 2021), https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (nothing "**the Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people**") (**emphasis added**).

33.     The Defendant HORIZON's Mandatory COVID-19 Vaccination Policy, on its face and as applied, impermissibly burdens Plaintiff's sincerely held religious beliefs, compels her to change those beliefs or act in contradiction to them, and forces her to choose between the teachings and requirements of her sincerely held religious beliefs in the commands of Scripture and the Defendant's imposed value system.

34.     That Defendant HORIZON'S Mandatory COVID-19 Vaccination Policy, on its face, and as applied, specifically targets Plaintiff's religious beliefs for disparate and discriminatory treatment.

35.     That Defendant has failed to make any accommodations provided the nature of Plaintiff's employment, in that the tasks can all be completed remotely, as they have been for nearly two years.

36.     That Defendant has refused to engage in the interactive process with Plaintiff regarding her religious accommodations from the Mandatory COVID-19 Vaccination Policy, and instead only responded that it would constitute an undue burden on Defendant HORIZON to offer any accommodations, even though light of the fact that Plaintiff works 100% remotely.

37.     That irrespective of the interactive process, Defendant failed to provide Plaintiff with reasonable accommodations for her religious beliefs, as indefinite leave or termination is not a reasonable accommodation—rather they are adverse employment actions.

## COUNT I –VIOLATIONS *of the* ILLINOIS
## HEALTH CARE RIGHTS OF CONSCIENCE ACT, 745 ILCS 70

10

Exhibit A

38.     Plaintiff realleges the above paragraphs and sets forth the same herein.

39.     That the general prohibition against religious based discrimination in the context of *Rushonian*[2] medical inviolability (and otherwise) has long since been codified under federal law both in case law and statute, but the Illinois General Assembly also sought fit to enshrine, as *public policy* in the State of Illinois, the right of the individual to engage in the exercise of his or her sincerely held religious beliefs as it pertains to health care services, without fear of discrimination from any entity, employer, or institution, whether public or private, including Defendant herein, HORIZON. *See* Illinois Health Care Right of Conscience Act ("HCRA"), 745 ILCS 70 *et seq*.

40.     That the Illinois Health Care Right of Conscience Act provides, specifically, at Section 2, as follows:

> **The General Assembly finds and declares that people and organizations hold different beliefs about whether certain health care services are morally acceptable. It is the <u>public policy</u> of the State of Illinois to respect and protect the right of conscience of all persons who refuse to obtain, receive or accept, or who are engaged in, the delivery of, arrangement for, or payment of health care services and medical care whether acting individually, corporately, or in association with other persons; and to prohibit all forms of discrimination, disqualification, coercion, disability or imposition of liability upon such persons or entities by reason of their refusing to act contrary to their conscience or conscientious convictions in refusing to obtain, receive, accept, deliver, pay for, or arrange for the payment of health care services and medical care.**

745 ILCS 70/2 (**<u>emphasis added</u>**).

41.     That the Illinois Health Care Right of Conscience Act makes clear, that discrimination from any public or private entity based on one's conscience (necessarily encompassing religious based considerations at subsection 70/3(e)) is unlawful, stating, in

---

[2] Dr. Benjamin Rush discussed previously.

Exhibit A

pertinent part that:

> **It shall be unlawful for any person, public or private institution, or public official to discriminate against any person in any manner, including but not limited to, licensing, hiring, promotion, transfer, staff appointment, hospital, managed care entity, or any other privileges, because of such person's conscientious refusal to receive, obtain, accept, perform, assist, counsel, suggest, recommend, refer or participate in any way in any particular form of health care services contrary to his or her conscience.**

745 ILCS 70/5.

42.     That the Illinois Health Care Right of Conscience Act further provides with respect to discrimination by employers or institutions, as follows:

> **It shall be unlawful for any public or private employer, entity, agency, institution, official or person, including <u>but not limited to</u>, a medical, nursing or other medical training institution, to deny admission because of, to place any reference in its application form concerning, to orally question about, <u>to impose any burdens in terms or conditions of employment on, or to otherwise discriminate against</u>, any applicant, <u>in terms of employment</u>, admission to or participation in any programs for which the applicant is eligible, or to discriminate in relation thereto, in any other manner, <u>on account of the applicant's refusal to receive, obtain, accept, perform, counsel, suggest, recommend, refer, assist or participate in any way in any forms of health care services contrary to his or her conscience.</u>**

745 ILCS 70/7 (<u>emphasis added</u>).

43.     That the Illinois Health Care Right of Conscience Act defines "[h]ealth care" in the broadest sense of the word, to include vaccinations.

> **"Health care" means any phase of patient care, <u>including but not limited to</u>, testing; diagnosis; prognosis; ancillary research; instructions; family planning, counselling, referrals, or any other advice in connection with the use or procurement of contraceptives and sterilization or abortion procedures; <u>medication</u>; or surgery or other care or treatment rendered by a physician or physicians, nurses, paraprofessionals or health care facility, <u>intended for the physical, emotional, and mental well-being of persons.</u>**

745 ILCS 70/3(a) (<u>emphasis added</u>).

12

Exhibit A

44. That the Illinois Health Care Right of Conscience Act defines "Conscience" as "a sincerely held set of moral convictions arising from belief in or relation to God, or which, though not so derived, arises form a place in the life of its possessor parallel to that filled by God among adherents to religious faiths." 745 ILCS 70/3(e).

45. That a violation of the Illinois Health Care Right of Conscience Act provides that a complainant bringing forth a claim against a person, association, corporation, entity, or health care facility, may recover his or her reasonable attorney's fees, litigation costs, and damages *__three times__* the actual amount, including pain and suffering, sustained by such person, but in no event shall the damage allotted for each violation be less than $2,500.00. *See* 745 ILCS 70/12.

46. That the Illinois Health Care Right of Conscience Act is no arcane vestigial statute that is to be relegated to the shelf or systematically ignored—the statute itself makes clear that "This Act shall supersede all other Acts or parts of Acts to the extent that any Acts or parts of acts are inconsistent with the terms or operation of this Act." 745 ILCS 70/14.

47. That even as a private institution, Defendant HORIZON is subject to the provision of the Illinois Health Care Right of Conscience Act under 745 ILCS 70/5 and 745 ILCS 70/7 and is therefore prohibited from discriminating against Plaintiff for her refusal, based on her closely and sincerely held religious beliefs, to receive, obtain, accept, or participate in its Mandatory COVID-19 Vaccination Policy.

48. That Plaintiff's sincerely held religious beliefs, which were articulated to HORIZON under a signed and written letter accompanied by an attestation from her Paster, constitute Plaintiff's "conscience" under the HCRA, because they are "a sincerely held set of moral convictions arising from belief in or relation to God." 745 ILCS 70/3(e).

49. That the COVID-19 vaccines constitute "Heath care" under the HCRA because

13

Exhibit A

they are a "phase of patient care," "medication," and/or "other care or treatment rendered by a physician or physician, nurses, paraprofessionals or health care facility, intended for the physical, emotional and mental well-being of person." 745 ILCS 70/3(a).

50.     That the Illinois General Assembly's attempt recently to carve a COVID-19 based exception to the Illinois Health Care Right of Conscience Act's general prohibitions against all private and public discrimination for refusing to accept "health care" for sincerely and closely held religious based objections, by articulating a "resolution" to clarify existing law passed by a previous legislature, in lieu of actually amending or modifying the statute, may be laudable in some circles, but Article II Section 1 of the Illinois Constitution makes clear that "[t]he legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." The Illinois Constitution states further under Article VI, Section 1 that "[t]he judicial power is vested in a Supreme Court, an Appellate Court and Circuit Court." Illinois SB1169, if and when signed into law by the Governor, has **no** bearing or effect on this Court's interpretation of the Illinois Health Care Right of Conscience Act in the instant matter.

51.     That the HCRA does not provide HORIZON with any defense to discriminate against Plaintiff based on so-called "undue hardship." *Rojas v. Martell*, 2020 IL App (2d) 19025, ¶ 43.

52.     That by imposing its Mandatory COVID-19 Vaccination Policy upon Plaintiff and refusing to grant her religious exemptions and reasonable accommodations from the Policy, HORIZON unlawfully and unconscionably discriminated against Plaintiff because of her conscientious refusal to receive or accept one of the available COVID-19 vaccinations available in contradiction to her right of conscience and sincerely held religious beliefs.

53.     That by threatening to and actually engaging in adverse employment action

14

Exhibit A

against the Plaintiff for failing to comply with the mandatory COVID-19 Vaccination Policy, HORIZON has impermissibly discriminated against the Plaintiff on account of her sincerely held religious objections to receiving or accepting one of the available COVID-19 vaccinations that are available in violation of 745 ILCS 70/5.

54.     That HORIZON's Mandatory COVID-19 Vaccination Policy, on its face and as applied, is a gross violation of Plaintiff's sincerely held religious beliefs, and her rights of conscience under the Illinois Health Care Right of Conscience Act.

55.     That HORIZON's Mandatory COVID-19 Vaccination Policy has caused, is causing and will continue to cause Plaintiff immediate and irreparable harm by denying her the statutory right to accept or refuse administration of a COVID-19 vaccine that violates her conscience and religious beliefs, in direction violation of the Illinois Health Care Right of Conscience Act.

56.     That Plaintiff has no adequate remedy at law to prevent the ongoing deprivation of her statutory rights under the Illinois Health Care Right of Conscience Act.

57.     That absent a Temporary Restraining Order and injunctive relief, HORIZON's deprivation of Plaintiff's rights to accept or refuse administration of "Health care" as that term is defined under the HCRA, will continue unabated, and will cause her to suffer for the exercise of her statutory rights under the Illinois Health Care Right of Conscience Act.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order as set forth in her Prayer for Relief below.

## COUNT II – VIOLATION OF TITLE VII, CIVIL RIGHTS ACT of 1964, 42 U.S.C. § 2000e, et seq.

58.     That Plaintiff realleges the above paragraphs and sets forth the same herein.

59.     That Title VII of the Civil rights Act of 1964 prohibits HORIZON from

15

Exhibit A

discriminating against employees on the basis of their sincerely held religious beliefs. 42 U.S.C. § 2000e-2(a).

60.     That Plaintiff holds a sincerely held religious belief that precludes her from receiving any of the COVID-19 vaccinations.

61.     That Plaintiff informed the Defendant HORIZON of her closely held sincere religious beliefs and requested religious exemptions and reasonable accommodations from its Mandatory COVID-19 Vaccination Policy.

62.     That Plaintiff has failed to engage in the interactive process with the Plaintiff regarding her religious accommodation requests.

63.     That the status and process of the interactive process notwithstanding, HORIZON failed to provide the Plaintiff with religious exemptions and reasonable accommodations, thereby discriminating against the Plaintiff because of her religious beliefs.

64.     That HORIZON's failure to provide religious exemptions and accommodations has harmed and will continue to harm the Plaintiff.

65.     That by failing to engage in the interactive process or offer any reasonable accommodations, HORIZON's discriminatory actions were intentional and/or reckless and in violation of Title VII of the Civil Rights Act of 1964.

66.     That Plaintiff has filed charged with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") complaining of these discriminatory actions, accompanied by a signed investigatory "opt-out" request for the immediate right to sue, which was granted by both the IDHR and the EEOC on November 4, 2021. *See* **Exhibit 5**, IDHR "Notice of Opt Out"; *see also* attached **Exhibit 6**, EEOC "Right to Sue Letter."

16

Exhibit A

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order as set forth in her Prayer for Relief below.

### COUNT III—VIOLATION OF EMERGENCY USE AUTHORIZATION PROVISION OF THE UNITED STATES CODE, 21 U.S.C. §360bbb-3, *et seq.*

67.　　That Plaintiff realleges the above paragraphs and sets forth the same herein.

68.　　That the Emergency Use Authorization ("EUAA") of the United States Code provides, in pertinent part, as follows:

> **Subject to the provisions of this section, the Secretary (of the Department of Health and Human Services) may authorize the introduction into interstate commerce, during the effective period of a declaration under subsection (b), of a drug, device, or biological product intended for use in an actual or potential emergency (referred to in this section as "emergency use."**

21 U.S.C. § 360bbb-3(a)(1).

69.　　That the EUAA, at subsection 360bbb-3(e)(1)(A) makes clear, in no uncertain terms, that all individuals to whom the product approved for Emergency Use must be given the option to accept or refuse administration of the product.

70.　　That specifically, that for any person carrying out activity for which the authorization is issued, must set forth and establish certain conditions to protect the public health, including informing the individuals for whom the product is being administered by providing the following "(I) that the Secretary has authorized the emergency use of the product; (II) of the significant known and potential benefits and risks of the emergency use of the product, and of the extent to which such benefits and risks are unknown; and (III) **of the option to accept or refuse administration of the product**, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available, and of their benefits and risks." *See* 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III) (**emphasis added**).

Exhibit A

71. That the EUAA is unambiguous—any individual to whom the product may be administered shall be given the right to accept or refuse administration of the product.

72. That the only currently available COVID-19 vaccinations (Johnson & Johnson, Moderna, and Pfizer/BioNTech) are only authorized for use under the Emergency Use Authorization statute and have no general approval under the United States Code.

73. That the despite misreporting, there is no COVID-19 vaccine available in the United States that has received full FDA licensing and approval.

74. That on August 23, 2021, the United States Food and Drug Administration issued two separate letters pertaining to two separate COVID-19 vaccines. See Letter, United States Food and Drug Administration to BioNTech Manufacturing GmbH (Aug. 23, 2021), https://www.fda.gov/media/151710/download ("BioNTech Letter"); Letter, United States Food and Drug Administration to Pfizer, Inc. (Aug. 23, 2021), https://www.fda.gov/media/150386/download ("Pfizer Letter"). (A true and correct copy of the BioNTech Letter is attached hereto as **Exhibit 6** and incorporated herein. A true and correct copy of the Pfizer Letter is attached hereto as **Exhibit 7** and incorporated herein.)

75. That in the Pfizer Letter, the FDA confirmed that, on December 11, 2020, it granted Emergency Use Authorization (EUA) for the Pfizer-BioNTech COVID-19 Vaccine. (Pfizer Letter at 1.) It also notes that the EUA was continued on December 23, 2020, February 25, 2020, May 10, 2021, June 25, 2021, and August 12, 2021. (Pfizer Letter at 1-2.)

76. That the Pfizer Letter also makes clear that there are scientific, manufacturing, and legal differences between the Pfizer-BioNTech COVID-19 Vaccine and the newly approved BioNTech COMIRNATY, COVID-19 Vaccine, mRNA. (Pfizer Letter at 2 n.9, 3 n.10.)

77. That specifically, the FDA stated that although COMIRNATY was granted full

18

Exhibit A

approval by the FDA, the Pfizer-BioNTech COVID-19 Vaccine was still only authorized under the EUA. (Pfizer Letter at 2 n.9 ("In the August 23, 2021, revision, FDA clarified that, subsequent to the FDA approval of COMIRNATY (COVID-19 Vaccine, mRNA) for the prevention of COVID-19 for individuals 16 years of age and older, this EUA would remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses. It also authorized COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved biologics license application (BLA)."

78.     That all existing vials of the Pfizer-BioNTech COVID-19 Vaccine remain available only under the authorization of the EUA. (Pfizer Letter at 2 n.9.)

79.     That On information and belief, the existing vials of Pfizer-BioNTech COVID-19 Vaccine in the United States number in the millions, and that all of these EUA vaccine doses will be administered before any does of the fully approved COMIRNATY are able to be injected into a single arm, meaning the fully approved COMIRNATY will not be available for administration in the United States in the near future.

80.     That upon information and belief, there are currently no available doses of COMIRNATY in the United States, and COMIRNATY is not being manufactured for production or distribution in the United States at this time. In fact, the FDA Pfizer Letter expressly admits and acknowledges that COMIRNATY is not available in the United States: "Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, **there is no sufficient approved vaccine** for distribution to the population." (Pfizer Letter at 6 n.12) (**emphasis added**). In fact, further acknowledging COMIRNATY was not publically available, when the FDA reapproved the Pfizer-BioNTech Covid-19 vaccine for EUA authorization in August, it was required to find that there were no

19

Exhibit A

alternatives available for the Pfizer-BioNTech vaccine. (See Pfizer Letter at 6 "There is no adequate, approved, and available alternative to the Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19").

81.    That the statutorily required Fact Sheets for each of the EUA COVID-19 vaccines acknowledge that individuals cannot be compelled to accept or receive the vaccine. See, e.g., Pfizer-BioNTech, Fact Sheet for Recipients and Caregivers (June 25, 2021), https://www.fda.gov/media/144414/download ("**It is your choice** to receive or not to receive the Pfizer-BioNTech COVID-19 Vaccine. Should you decide not to receive it, it will not change your standard medical care." (**emphasis added**)).

82.    That since all three of the currently available COVID-19 vaccines are subject only to Emergency Use under the EUAA, any and all individuals to whom the product may be administered, including the Plaintiff, **must** be given, and do in fact and in law, retain the right to accept or refuse administration of the product.

83.    That by imposing a mandatory vaccination policy on Plaintiff and refusing to grant her requests for religious exemption from such mandatory policies, HORIZON is denying Plaintiff her right to accept or refuse administration of the three currently available COVID-19 vaccines, which are subject only to Emergency Use approval under the EUAA.

84.    That by denying Plaintiff's right to accept or refuse administration of the three currently available COVID-19 Emergency Use Authorized vaccines, the Defendant HORIZON is violating the Emergency Use Authorization statute.

85.    That by denying Plaintiff's her requested religious exemption and reasonable accommodation, Defendant HORIZON is denying Plaintiff her statutory rights under the United States Code and infringing upon the explicit protections outlined in the Emergency Use

Exhibit A

Authorization statute.

86.   That Defendant HORIZON's COVID-19 vaccination policy has caused, is causing, and will continue to cause Plaintiff immediate and irreparable harm by denying her statutory right to accept or refuse administration of the three COVID-19 vaccines, which are subject only to Emergency Use under the Emergency Use Authorization statute.

87.   That Plaintiff has no adequate remedy at law to prevent the ongoing deprivation of her statutory rights under the EUAA to be given the right to accept or refuse administration of the COVID-19 vaccines currently available and authorized for emergency use solely under the EUAA.

88.   That absent the entry of a preliminary injunction, HORIZON's deprivation of Plaintiff's right to accept or refuse administration of a product subject only to Emergency Use Authorization will cause her to continue suffering adverse employment action from the Defendant HORIZON.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order as set forth in her Prayer for Relief below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays from this Honorable Court an order granting the following relief:

A. That the Court issue a Temporary Restraining Order restraining and enjoining HORIZON, all its officers, agents, employees, and attorneys, and all other persons in active concert or participating with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with HORIZON's mandatory vaccination policy or any other written or unwritten policy or practice denying Plaintiff

21

Exhibit A

her right to accept or refuse administration of the COVID-19 vaccines under the Emergency Use Authorization statute, or subjecting Plaintiff to discrimination for the exercise of her sincerely held religious beliefs against administration of the COVID-19 vaccines in violation of the Illinois Health Care Right of Conscience Act or Title VII of the Civil Rights Act of 1964.

B. That the Court issue a Preliminary Injunction pending trial, and a Permanent Injunction upon judgment, restraining and enjoining HORIZON, all its officers, agents, employees, and attorneys, and all other persons in active concert or participating with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with HORIZON's mandatory vaccination policy or any other written or unwritten policy or practice denying Plaintiff her right to accept or refuse administration of the COVID-19 vaccines under the Emergency Use Authorization statute, or subjecting Plaintiff to discrimination for the exercise of her sincerely held religious beliefs against administration of the COVID-19 vaccines in violation of the Illinois Health Care Right of Conscience Act or Title VII of the Civil Rights Act of 1964.

C. That this Court render a Declaratory Judgment declaring that HORIZON's Mandatory COVID-19 Vaccination Policy, both on its face and as applied by HORIZON, is illegal and unlawful under the Emergency Use Authorization statute, 21 U.S.C. §360bbb-3(e)(1)(A)(ii)(III), the Illinois Health Care right of Conscience Act, 745 ILCS 70/5 and 745 ILS 70/7, and Title VII, 42 U.S.C. §2000e, *et seq.*, and further declaring that:

   a. By placing Plaintiff on unpaid leave or terminating Plaintiff from employment with HORIZON or by threating to so terminate or remove Plaintiff from her current position, HORIZON has unlawfully denied Plaintiff her statutory rights

Exhibit A

under the Emergency Use Authorization statute to refuse administration of a product granted only Emergency Use Authorization; and

b. By placing Plaintiff on unpaid leave or terminating Plaintiff from employment with HORIZON, or by threatening to so terminate or remove Plaintiff from her current position, HORIZON has unlawfully discriminated against Plaintiff on account of her sincerely held religious beliefs to receiving or accepting one of the three COVID-19 vaccines in violation of 745 ILCS 70/5 AND 745 ILCS 70/7 and Title VII of the Civil Rights Act of 1964.

D. That this Court enter an award of damages to Plaintiff in an amount to be proven at trial (but not less than $2,500 per violation, as provided by 745 ILC 70/12), and treble damages as provided by 745 ILCS 70/12, including those for pain and suffering, that Plaintiff sustained as a result of HORIZON's discriminatory, unconscionable, and unlawful Mandatory COVID-19 Vaccination Policy.

E. That this Court adjudge, decree, and declare the rights and other legal obligations and relations within the subject matter here in controversy so that such declaration shall have the full force and effect of a final judgment.

F. That this Court retain jurisdiction over the matter for purposes of enforcing the Court's order.

G. That this Court award Plaintiff her reasonable attorney's fees, costs, and expenses of this action, as required by 745 ILCS 70/12 and Title VII.

H. That the Court grant such other and further relief as is just and proper.

Robert J. Tomei Jr.
IL Bar No.: 6310339
JOHNSTON TOMEI
LENCZYCKI & GOLDBERG, LLC

Respectfully Submitted,
Plaintiff Noel Stuertz
By: _/s/ Robert J. Tomei Jr._
Attorney for Plaintiff

23

Exhibit A

350 N Milwaukee Ave., Ste. 202
Libertyville, IL 60048
P: (847) 549-0600;
F: (847) 589-2263
E: Rob@LawJTLG.com

Exhibit A

## VERIFICATION

Under penalties as provided by law pursuant to 735 ILCS 5/1-109 of the Code of Civil Procedure, the undersigned certify that the statements set forth in the instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certify as aforesaid that they verily believe the same to be true.

Noel Stuertz

Exhibit A

# EXHIBIT 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

## FAQ TOPIC AREAS

Horizon's Vaccination Policy    1

Getting Vaccinated    3

Vaccine Safety and Efficacy    4

Medical and Religious Exemptions    8

Workplace Safety    8

Return to Office and Field    10

## HORIZON'S VACCINATION POLICY

1. **Why did Horizon decide to require the COVID-19 vaccine?**

   The COVID-19 vaccines are safe and effective at preventing the spread of the virus, as well as hospitalizations and death. The evidence is clear, and we believe in the science. As a leading health care company, we have a duty to ensure the safety of our employees as well as the patients and physicians we serve. We also must protect the most vulnerable members of the communities where we live and work. For these reasons, our leadership team has unanimously determined that requiring all Horizon employees to be vaccinated is the right thing to do and in line with our highest corporate values.

2. **When is the policy requiring COVID-19 vaccination going into effect?**

   Effective Oct. 15, 2021, Horizon will require all U.S.-based employees to be fully vaccinated, as a condition of employment, with one of the vaccines currently approved (Pfizer) or granted emergency use authorization (Moderna and Johnson & Johnson) by the U.S. Food & Drug Administration (FDA), or receive an approved accommodation. Horizon will also require anyone visiting Horizon facilities be fully vaccinated. Fully vaccinated is defined as two weeks after your final dose of the Pfizer, Moderna or Johnson & Johnson vaccine. We will provide medical and religious accommodations as required by law.

3. **At first, Horizon did not require employees to get the vaccine. What changed?**

   Despite all the progress we have made in administering the vaccine in the United States, COVID-19-related outbreaks and deaths are accelerating with the emergence of the delta variant. We believe the responsible course of action is to require vaccination of our U.S.-based employees, along with anybody working in or visiting our buildings to provide protection to everybody.

4. **Who must get vaccinated under this policy?**

   All U.S. employees and temporary workers (current and future), regardless of work location, along with anybody working in or visiting our facilities must comply with Horizon's mandatory COVID-19 vaccination policy.

Exhibit 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

5.  **NEW: Do temporary workers (i.e., contingent labor) comply with Horizon's vaccine mandate?**
    Yes, temporary workers have the same requirements as employees. If you are a manager and have questions about your temporary worker's status, please contract HRNow.

6.  **NEW: Does this policy apply to employee located outside of the U.S.?**
    No, this policy only applies to U.S.-based employees and temporary workers.

7.  **Is it legal to for employers to mandate the COVID-19 vaccine?**
    Yes, guidance issued from the Equal Employment Opportunity (EEO) Commission on May 28, 2021, states employers can require employees to get the COVID-19 vaccination: *"The federal EEO laws do not prevent an employer from requiring all employees physically entering the workplace to be vaccinated for COVID-19, subject to the reasonable accommodation provisions of Title VII and the ADA and other EEO considerations."*

8.  **Why is Horizon requiring COVID-19 vaccinations when not all biotech companies are?**
    As a leading health care company, we have a duty to ensure the safety of our employees as well as the patients and physicians we serve. We also must protect the most vulnerable members of the communities where we live and work. For these reasons, our leadership team has unanimously determined that requiring all Horizon employees to be vaccinated is the right thing to do and in line with our highest corporate values.

9.  **I work remotely. Do I need to be vaccinated?**
    Yes. The COVID-19 vaccination will be a condition of employment at Horizon, regardless of where you work. Many remote employees visit health care facilities and vaccination will ensure the safety of all Horizon's employees and their availability for onsite work, if required. Full vaccination is required by October 15, 2021.

10. **NEW: I am on a medical leave of absence. Do I need to get vaccinated by Oct. 15, 2021?**
    If you are on an approved short-term disability leave, please reach out to HRNow to discuss your individual situation.

11. **NEW: I am on a parental leave of absence. Do I need to get vaccinated by Oct. 15, 2021?**
    If you are on a parental leave, you must be vaccinated or receive an approved accommodation by Oct. 15, 2021.

12. **Is COVID-19 going to be an annual vaccination requirement?**
    So far, the available vaccines appear to provide a strong immune response that provides good protection for at least nine months, and likely longer. Whether boosters will be needed will depend on how long that protection lasts and how well that protection continues to work against new virus strains or variants. We will follow guidance set forth by the CDC and FDA as we learn more about how long the vaccines are providing effective protection.

Exhibit 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

13. **Will co-workers who are terminated for not getting the vaccine be eligible for rehire?**

    Yes. Individuals may be eligible for rehire in the future if they complete all the requirements for rehire, which includes COVID-19 vaccination.

14. **If I resign, do I get unemployment?**

    Unemployment compensation eligibility decisions are made by the state where you work, not by Horizon.

15. **Does Horizon pay me for the time required to get vaccinated?**

    You should follow the same practice used when getting your annual flu shot. There are many vaccination clinics where individuals can choose to a convenient day to receive their vaccination. Many are open seven days a week with various hours of operation.

16. **Once I am fully vaccinated, where do I go to show my vaccination card?**

    Scan and send a copy of both sides of your vaccination card, including the type of vaccine, batch number and date of vaccination and send it to the confidential corporate security mailbox at vaccination@horizontherapeutics.com. If you did not retain your CDC COVID-19 Vaccination Card, you should contact the location in which you received your vaccine and they will send you another copy (typically a PDF form via email).

17. **NEW: Why can't employees submit to regular testing instead of vaccination requirement?**

    Horizon believes the most effective way to protect employees against COVID-19 is the vaccine. The evidence is clear, and we believe in the science. As a leading health care company, we have a duty to ensure the safety of our employees as well as the patients and physicians we serve. We also must protect the most vulnerable members of the communities where we live and work. For these reasons, our leadership team has unanimously determined that requiring all Horizon employees to be vaccinated is the right thing to do and in line with our highest corporate values.

## GETTING VACCINATED

18. **What qualifies as being fully vaccinated?**

    To be fully vaccinated under the mandate, you need to have either one dose of the Johnson & Johnson vaccine or both doses of the Pfizer or Moderna vaccine. You must have received either the one-dose vaccine or the second dose of a two-dose vaccine by October 1 to meet the vaccine requirement. (There is a two-week period after receiving the vaccine to build up full immunity; however, you will meet the Horizon vaccine requirement by receiving the shot by the deadline.)

Exhibit 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

19. **I received one dose of Pfizer or Moderna. Do I need to get the second dose, too?**

Yes. To fulfill the vaccine requirement, you must have two doses of Pfizer or Moderna or one dose of the Johnson & Johnson by the vaccination deadline of October 1. There is no maximum time interval between doses, so the second dose can be any time after the first dose; there is no need to "restart" the two-shot series if it has been more than 21 (or 28) days since your first dose. Schedule an appointment at any vaccine clinic or visit your physician's office and your documentation will be automatically recorded.

20. **Where should I go to get vaccinated?**

You can find a location and schedule an appointment using VaccineFinder, a free online service where users can search for pharmacies and providers that offer vaccination. Information about where COVID-19 vaccines are available is provided directly by pharmacies and providers, in collaboration with states, and is updated daily.

21. **What happens if I choose not to get the COVID-19 vaccine or am not fully vaccinated by October 15, 2021?**

Employees and people that work in Horizon facilities who are not vaccinated or granted an exemption and reasonable accommodation by the October 15, 2021 deadline will be suspended without pay for up to 30 days so that they come into compliance. Employees may not use their PTO during this time, but all benefits will remain intact. After 30 days, those individuals who have not fulfilled the requirements of this policy by receiving the complete dosing regimen of one of the COVID-19 vaccines currently authorized by the FDA or an approved medical or religious exemption will be terminated from Horizon as a voluntary resignation.

Employees may be disciplined and even terminated, depending on the circumstances, if they intentionally violate this policy or provide false or misleading information to show they were vaccinated or to support an exemption request.

22. **Can Horizon "force" me to get vaccinated if I don't share the same views as leadership regarding the safety or need for the COVID-19 vaccination?**

We have no intention of forcing anyone to do anything that they are opposed to. If you do not want to get vaccinated, it is ultimately your choice. However, getting vaccinated is a condition of employment. It is not an option to choose not to get vaccinated and to continue to be employed by Horizon.

## VACCINE SAFETY AND EFFICACY

23. **Why is this mandate being put in place prior to the Moderna and Johnson & Johnson vaccines receiving full approval by the FDA?**

Mandating the vaccine was not a decision we made lightly. Throughout the clinical trials. administration under emergency use authorization (EUA), and recent approval of the Pfizer vaccine, the vaccines have proven to be extremely effective and safe. Across the country, there is high confidence that it is only a matter of time before the FDA grants full approval to the Moderna and Johnson & Johnson vaccines. To date, COVID-19 vaccines have been administered to over 167 million Americans – more than half the country – and the number increases each day.

Exhibit 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

24. **Are the vaccines approved by the Food and Drug Administration (FDA)?**
The Pfizer vaccines has been approved by the FDA. The Moderna and Johnson & Johnson vaccines have been granted an emergency use authorization (EUA) by the FDA but have yet to be given full approval. The FDA offers the availability and use of potentially lifesaving medicines during public health emergencies.

25. **How can Horizon require the vaccine as a condition of employment while it is still under Emergency Use Authorization (EUA)?**
Employers are not prevented from requiring the COVID-19 vaccination for their employees or individual's working in or visiting their offices while the vaccine is in EUA status because the vaccines have proven to be safe and effective by the FDA.

26. **As we see and have heard on the news, people can get COVID-19 even when vaccinated. Why should we be required to be vaccinated if it does not provide full immunity?**
As with any vaccine, there will be some breakthrough cases, most often mild illness, but the COVID-19 vaccines have continued to reduce the risk of infection by over 90% in wide use. The COVID-19 vaccines remain our best defense against the illness. The EUA does not impose any obligations or restrictions on employers. The Equal Employment Opportunity (EEO) Commission has issued guidance indicating employers can mandate COVID-19 vaccination notwithstanding the EUA status.

27. UPDATED: **I'm trying to conceive, hope to become pregnant soon or am breastfeeding. Do I still need to get vaccinated?**
Yes. The American College of Obstetricians and Gynecologists (ACOG) states if you are planning or trying to get pregnant, you should get a COVID-19 vaccine. There is no evidence that the COVID-19 vaccines cause infertility. You also do not need to delay getting pregnant after you get a vaccine. In addition, the ACOG recommends that you should get a COVID-19 vaccine during pregnancy. ACOG recommends that all pregnant women be vaccinated against COVID-19. Getting a vaccine could help both you and your fetus. Remember that pregnant women have a higher risk of severe illness from COVID-19 than nonpregnant women. The vaccines are very effective at preventing COVID-19 infection, severe illness and death. Breastfeeding women should also get a COVID-19 vaccine. There is no need to stop breastfeeding if you want to get a vaccine. When you get vaccinated, the antibodies made by your body may be passed through breastmilk and may help protect your child from the virus. For more detailed information, visit the ACOG website at https://www.acog.org/womens-health/faqs/coronavirus-covid-19-pregnancy-and-breastfeeding.

Additionally, the CDC recommends COVID-19 vaccination is recommended for people who are pregnant, breastfeeding, trying to get pregnant now, or might become pregnant in the future. Evidence about the safety and effectiveness of COVID-19 vaccination during pregnancy has been growing. These data suggest that the benefits of receiving a COVID-19 vaccine outweigh any known or potential risks of vaccination during pregnancy. There is currently no evidence that any vaccines, including COVID-19 vaccines, cause fertility problems in women or men. For more information, visit the CDC website at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/pregnancy.html

Exhibit 1

**Exhibit A**

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

28. UPDATED: I am pregnant, can I get a medical exemption?

You can apply for a time-limited exemption. Pregnant co-workers are encouraged to discuss COVID-19 vaccination with their healthcare provider, and to strongly consider vaccination. Pregnant people are more likely to become severely ill with COVID-19 as compared to non-pregnant people. According to the American College of ACOG, Obstetricians and Gynecologists (ACOG), it is safe for pregnant people to get a COVID-19 vaccine. Getting vaccinated during pregnancy can protect you from severe COVID-19 disease. There is limited but growing evidence about the safety of the COVID-19 vaccines when used during pregnancy. Newborns of vaccinated mothers have been shown to have antibodies against COVID-19, which could help protect them. Based on the science behind the mRNA vaccines and the viral vector vaccines, experts believe these vaccines are unlikely to pose a risk to pregnant people or their unborn child. Pregnant people granted a time-limited exemption will be expected to be fully vaccinated by the time they return to work from their maternity leave. For more detailed information, visit the ACOG website at https://www.acog.org/womens-health/faqs/coronavirus-covid-19-pregnancy-and-breastfeeding.

Additionally, the CDC recommends COVID-19 vaccination is recommended for people who are pregnant, breastfeeding, trying to get pregnant now, or might become pregnant in the future. Evidence about the safety and effectiveness of COVID-19 vaccination during pregnancy has been growing. These data suggest that the benefits of receiving a COVID-19 vaccine outweigh any known or potential risks of vaccination during pregnancy. There is currently no evidence that any vaccines, including COVID-19 vaccines, cause fertility problems in women or men. For more information, visit the CDC website at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/pregnancy.html

29. I am undergoing fertility treatments. Can I receive an exemption?

Individuals who are scheduled to undergo fertility treatments or are currently receiving fertility treatments should work with their healthcare providers to plan the timing of the COVID-19 vaccination series around their planned fertility treatments. Those who are currently undergoing fertility treatment should wait to determine whether they are pregnant, and if so, may pursue a time-limited exemption for pregnancy. If they do not become pregnant during this treatment cycle, then they should speak with their healthcare provider to decide the best timing to complete their COVID-19 vaccination requirement by October 15, 2021.

30. I had COVID-19 already or I have the antibodies. Do I still need to get vaccinated?

Yes. COVID-19 vaccinations are required for all Horizon U.S. based employees and anybody that works in our U.S. facilities. Evidence is clear that COVID-19 vaccines have proven to be safe and effective at preventing the spread of the virus, as well as hospitalization and death. People with natural immunity after COVID-19 infection must still get vaccinated once they recover from the illness. This includes people who have detectable antibody levels after having recovered from COVID-19 infection. The protective immunity after natural immunity differs person to person, and the duration of the immunity is unknown. Refer to guidance from the CDC for more detailed information: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/prepare-for-vaccination.html. Vaccine immunity provides reliable protection. Individuals who have been diagnosed

Exhibit 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

with COVID-19 infection should hold off on vaccination until they have completed their period of isolation and have recovered from their illness. Once recovered, however, the individual must get vaccinated.

31. **I had a bad reaction after my first dose. Do I still need to get the second dose?**

If you had a reaction to the first dose beyond the typical side effects, you should reach out to your provider to discuss the reaction, your concerns and whether you should file a medical exemption request.

32. **If I get one of the vaccines and get serious negative side effects, how does Horizon plan to handle my situation?**

If on the rare occasion someone experiences serious and incapacitating side effects (i.e., is unable to perform the essential functions of their job) from the COVID-19 vaccine, Horizon will provide the employee with one day of COVID paid time off, which can be used immediately following the date of initial or follow up vaccination. This paid time off is a separate pay category that is listed in Workday. Employees will <u>not</u> have to use PTO or short-term disability for this time away for serious and incapacitating side effects that prevent them from working. A request for paid time off due to an incapacitation to the COVID-19 vaccine must be submitted in a timely manner and supported by proof of vaccination. This documentation should be submitted to the employee's manager and the HRNow Engagement Center, <u>HR@horizontherapeutics.com</u> for audit/tracking purposes.

If an employee suffers any side effects, illness or injury caused by the vaccination, any lost wages or permanent impairment caused by those side effects may be covered by Horizon's workers' compensation program. Employees who develop any such adverse effects from the COVID-19 vaccination should reach out to the HR team by sending an email to the HRNow Engagement Center at <u>HR@horizontherapeutics.com</u> so coverage determinations can be made.

33. **I am concerned about the safety of the vaccine. How can I get more information?**

If you have specific concerns, you should talk to your healthcare provider and/or refer to the Centers for Disease Control (CDC) website.

As background, the Centers for Disease Control and Prevention (CDC) and Food and Drug Administration (FDA) monitor all U.S. vaccines for safety and provide data and insight continuously to government health agencies, public health partners and the public. The CDC, along with the FDA and other federal partners, is using established safety systems to conduct heightened safety monitoring of COVID-19 vaccines. If a link is found between a side effect and a COVID-19 vaccine, public health officials take appropriate action by weighing the benefits of the vaccine against its risks to determine if recommendations need to be changed. You can also find additional general information on COVID-19 vaccine safety from the Centers for Disease Control and Prevention (CDC) <u>https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety.html.</u>

Exhibit 1

**Exhibit A**

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

## MEDICAL AND RELIGIOUS EXEMPTIONS

**34. How do I apply for an exemption to the COVID-19 vaccine policy, and what is the deadline?**

Medical and religious exemption requests must be submitted *prior to September 10, 2021.*

**Medical Exemption**

Exemptions to the mandatory COVID-19 vaccination requirement may be granted for certain medical conditions. Individuals requesting an exemption because of a medical condition must obtain a medical certification from their healthcare provider and electronically submit a request for accommodation to the HRNow Engagement Center by calling 833.496.4769 or email your request to HR@horizontherapeutics.com.

**Religious Exemption**

Exemptions to the mandatory COVID-19 vaccination requirement may also be granted if vaccination conflicts with the tenets of a sincerely held religious belief. Individuals requesting an exemption because of sincerely held religious beliefs should obtain certification from their religious leader (or other person who can attest the individual's religious beliefs are sincerely held) and submit a request for accommodation to the HRNow Engagement Center by calling 833.496.4769 or email your request to HR@horizontherapeutics.com.

Please provide as much information and detail supporting the requested exemption as possible. Human Resources may contact you requesting additional information. Requests may be denied based on the inadequacy of information.

## WORKPLACE SAFETY

**35. NEW: If I get the vaccination, do I still have to wear my mask at work?**

Horizon has reinstated a mask requirement for all employees, temporary workers and visitors in all U.S. locations, regardless of vaccination status. This decision was made in alignment with CDC guidance as our offices are located in areas currently designated as substantial or high transmission by the CDC. The new mask mandate means you must wear a mask any time you are in any U.S. offices. Exceptions include when you are alone in an/your enclosed office, eating or outside. Additionally, you must wear a mask when alone at your workstation. Updates will be communicated on a location specific basis.

**36. NEW: I am fully vaccinated; do I have to wear a mask?**

Masks must continue to be worn when in any Horizon location. Exceptions include when you are alone in an enclosed office, eating in the Deerfield café or outside. Employees must continue to wear a mask when alone at their workstations. For employees representing Horizon externally masks should be worn in all situations where it is recommended/mandated by CDC or local guidelines.

Exhibit 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

37. **NEW: I am not fully vaccinated; do I have to wear a mask?**
Masks must continue to be worn when in any Horizon location. Exceptions include when you are alone in an enclosed office, eating in the Deerfield café or outside. Employees must continue to wear a mask when alone at their workstations. When a not fully vaccinated employee representing Horizon externally masks must be worn at all times.

38. **NEW: Does it impact employees located outside the U.S. from traveling to any Horizon Office in the U.S.?**
Employees travelling to a Horizon location in the U.S. from another country will be required to show government sanctioned documentation (which can include an ID card or mobile app) confirming they are fully vaccinated as defined within their country of residence.

39. **NEW: Will Horizon provide COVID-19 testing onsite?**
No, given the availability of testing across the country, employees can leverage offsite testing if needed. Testing of COVID-19 is covered at no charge to employees on any of Horizon's medical plans, if testing is ordered by a physician. For employees on the High Deductible Health Plan (HDHP), testing will still be covered even if you have not yet met your deductible for the year.

40. **NEW: Are there any limits to the size of meetings held at Horizon facilities?**
There are no limitations on meetings held at Horizon's facilitates except room capacity and location specific mask requirements.

41. **NEW: Are there any limits to the size of meetings held outside of Horizon facilities?**
Meeting limits are based on local COVID-19 guidance, room capacity and participants willingness to attend.

42. **NEW: What are Horizon's current internal meeting guidelines?**
In-person meeting participation is optional and virtual options will be provided for all meetings. Employees should not travel to internal meetings.

43. **NEW: What happens if I am in close contact (within 6 feet of someone for a cumulative total of 15 minutes or more over a 24-hour period) with someone with COVID-19?**

**If Vaccinated:**
CDC guidance states, if you've had close contact with someone who has COVID-19, you should get tested 3-5 days after your exposure, even if you don't have symptoms. You should also wear a mask indoors in public for 14 days following exposure or until your test result is negative. You should isolate for 10 days if your test result is positive.

**If Not Fully Vaccinated:**
CDC guidance states to stay home for 14 days after your last contact with a person who has COVID-19. Watch for fever (100.4∘F), cough, shortness of breath, or other symptoms of COVID-19. Contact your local public

Exhibit 1

Exhibit A

**Horizon's COVID-19 Frequently Asked Questions**
Updated August 30, 2021

health authority or healthcare provider. You may be able to shorten your quarantine after 7 days if you test negative for COVID-19 (test must occur at least 5 days after exposure) but your local public health authorities make the final decisions about how long quarantine should last, based on local conditions and needs.

## RETURN TO OFFICE AND FIELD

**44. NEW: Can employee work full time remote?**

Horizon's full return to office has been pushed back from Sept. 1, 2021 to Oct. 15, 2021 to align to Horizon's requirement that all employees must be vaccinated by Oct. 15, 2021. Starting on Oct. 15, employees must be able to work at their assigned work location.

**45. NEW: Employee moved during pandemic, do they have to return?**

Starting on Oct. 15, 2021, employees must be able to work at their assigned work location. Just like employees commuting locally to their assigned office location, employees must pay for their own travel and do so on their own time if they choose to live outside of daily commuting distance.

*As stated in its other policies, Horizon does not discriminate against its employees (or applicants) with regard to race, color, religion, sex (including pregnancy, sexual orientation, or gender identity), national origin, age, disability and genetic information (including family medical history), or any other characteristic protected by federal, state, or local law. Horizon also accommodates disabilities and sincerely held religious beliefs to the extent required by law and prohibits retaliation for any conduct protected by applicable law. Although an accommodation request may be denied if it poses an undue burden on Horizon and/or presents a direct threat to the health and safety of others, Horizon will not retaliate against any employee merely for requesting an accommodation.*

*If you believe that you have been treated in a manner not in accordance with this non-discrimination/non-retaliation policy, please notify your HR business partner immediately.*

Exhibit 1

# Exhibit A

# EXHIBIT 2

Exhibit A

September 8, 2021

Horizon Therapeutics
One Horizon Way
Deerfield, IL 60015

Attn: Human Resources

To Whom It May Concern:

Because of my deeply held religious beliefs based on a Christian biblical worldview I am requesting a religious accommodation, and I cannot in good conscience consent to receiving the Covid-19 vaccine as is currently mandated by Horizon Therapeutics policy.

The current Covid-19 vaccines, which include the COVID-19 mRNA vaccines and the Johnson & Johnson/Janssen vaccine, contain—or were tested using—cell lines from aborted fetal tissue. The Johnson & Johnson/Jansen vaccine uses fetal retinal cells while the Pfizer and Moderna vaccines test their messenger RNA components on fetal cell lines.

As it says in Psalm 139:13: *For you created my inmost being, You knit me together in my mother's womb.* According to scripture, human life, from conception to the moment God calls us home to heaven, is extremely sacred. Therefore, I cannot consent to being injected with any pharmaceutical treatment originating from aborted human fetal tissue and dishonors the lives of the unborn, as well as the scriptures.

The United States Constitution, the supreme law of the land, does not permit organizations to deny individuals their First Amendment rights and compel them to accept invasive medical procedures against their sincerely held religious beliefs. This law does not become irrelevant or inapplicable during a pandemic.

The Constitution's Free Exercise Clause protects not just the right to believe or the right to worship; it protects the right to perform or abstain from performing certain physical acts in accordance with one's beliefs. Federal statutes, including the Religious Freedom Restoration Act of 1993 (RFRA), reinforce these protections, broadly defining the exercise of religion to encompass all aspects of observance and practice, whether central to, or required by, a particular religious faith.

As you are aware, throughout the entire period of the pandemic, I have been diligently working in accordance with Horizon's established policies as is required of all employees. But the law requires that employers extend religious exemptions and accommodations from policies that might violate an employee's sincerely held religious beliefs.

The law does not recognize the need for employers to consult religious scholars or examine various church doctrines before extending these accommodations. A religious exemption must be based on the deeply held beliefs as expressed by each individual, not an employer's interpretation of various church doctrines, or religious organization and scholarly opinions.

Thank you for your time, consideration, and understanding in this matter.

Sincerely,

*Noel Stuertz*

Noel Stuertz
Director, Market Research
Horizon Therapeutics

Exhibit 2

Exhibit A

# EXHIBIT 3

Exhibit A

# Hope Lutheran Church

5159 Madison Street
Hillside, Illinois 60162-1428
708-449-8688
HopeHillside@gmail.com

*Rev. Steven J. Cornwell, Pastor*
708-227-5279
SJCornwell@cs.com

Horizon Therapeutics
One Horizon Way
Deerfield IL 60015

8 September 2021

Dear Sir or Madam:

I write regarding the request by Noel Stuertz for a religious exemption from the Covid vaccine mandate for your employees. As a lifelong family friend, I know her to be a professing Lutheran and Bible-believing Christian.

The Fifth Commandment says "You shall not murder" (Exodus 20:13). Following Martin Luther, we believe this means that we should fear and love God so that we do not hurt nor harm our neighbor in his body, but help and support him in every physical need. The least of these neighbors are unborn children, who are to be given life, helped, and supported. The taking of life through abortion is a sin against this Commandment.

While our Church does not oppose vaccination in general, the use of aborted fetal cells in the design, development, production, and testing of vaccines may cause a crisis of conscience due to the use of cell lines from the remains of aborted children. A Christian should not be compelled to violate his or her conscience in this matter.

We always are concerned for the well being of our neighbors in every physical way, including the physical well being of our neighbors who may be endangered by the virus in a work setting. However, to go against conscience is never right, nor should any Christian be forced to do so as a condition of employment.

Given that such is the sincerely-held belief of Ms. Stuertz, I respectfully request that you allow the religious exemption she has requested.

Sincerely,

Steven J. Cornwell
Pastor

*The Lutheran Church Missouri Synod*

Exhibit 3

Exhibit A

# EXHIBIT 4

Exhibit A

Wednesday, October 6, 2021 at 9:54:37 PM Central Daylight Time

Subject: Fwd: Noel Stuertz – Case#000161
Date: Tuesday, September 21, 2021 at 6:44:56 PM Central Daylight Time
From: Noel Stuertz
To: Noel Stuertz

Sent from my iPhone

Begin forwarded message:

> From: Human Resources <HR@horizontherapeutics.com>
> Date: September 21, 2021 at 5:07:04 PM CDT
> To: Noel Stuertz <NStuertz@horizontherapeutics.com>
> Cc: Human Resources <HR@horizontherapeutics.com>
> Subject: Noel Stuertz – Case#000161

> Dear Noel,

> Thank you for your religious exemption request. Your religious beliefs may be valid and sincere and preclude you from taking the vaccine such that the Company would otherwise approve your request. However, there is no sufficiently safe and acceptable accommodation or alternative based on your position and role with the Company. Allowing you to continue your job responsibilities while remaining unvaccinated would impose an undue hardship on the Company, would impose extra administrative burdens and costs on the Company, and creates an unreasonable level of safety risk to coworkers and third parties with whom you would need to interact and have prolonged close contact.

> If an effective alternative is identified, the Company might change its decision in this regard. In the meantime, if you are not fully vaccinated prior to the October 15 deadline, you will be placed on an unpaid leave of absence for up to 30 days. If you receive the vaccine (either one dose of the Johnson & Johnson vaccine, or the first dose of the Pfizer or Moderna vaccine), we may make an accommodation for you to return to work with specific guidance based on your position until you are fully vaccinated.

> If after the 30-day unpaid leave period you are still not vaccinated, it may result in termination of your employment.

> Please let us know if you have any questions.

> Thank you,
> The Accommodation Review Committee

Page 1 of 1

Exhibit 4

Exhibit A

# EXHIBIT 5

Exhibit A

STATE OF ILLINOIS   }
                } ss
COUNTY OF COOK   }              **CHARGE NO. 2022CF0323**

### AFFIDAVIT OF SERVICE

Margaret Lindenberg, deposes and states that s/he served a copy of the attached

NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE

PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR

OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND

ORDER OF ADMINISTRATIVE CLOSURE on each person named below by

depositing the same on   November 4, 2021  , in the U.S. Mail Box at 555   West

Monroe   Street, Chicago,   Illinois,   properly   posted   for  FIRST  CLASS

MAIL, addresses as follows:

| For Complainant | For Respondent |
|---|---|
| Robert J. Tomei, Jr.<br>Johnston, Tomei,<br>Lenczycki & Goldberg, LLC<br>350 N. Milwaukee Ave.<br>Suite 202<br>Libertyville, IL 60048 | Chief Executive Officer<br>Horizon Therapeutics USA, Inc.<br>1 Horizon Way<br>Deerfield, IL 60015 |

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

_____
Margaret Lindenberg

### PLEASE NOTE:

The above-signed person is responsible only for mailing these documents. Illinois Department of Human Rights' staff are not permitted to discuss the investigation findings once a Notice of Dismissal or Order of Closure has been issued.

Exhibit 4

# Exhibit A

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

IN THE MATTER OF:
NOEL STUERTZ,

                       COMPLAINANT,    )  CHARGE NO.    2022CF0323
AND                               )  EEOC NO.     21BA20075

HORIZON THERAPEUTICS USA, INC.,

                       RESPONDENT.    )

## NOTICE OF OPT OUT OF THE INVESTIGATIVE AND ADMINISTRATIVE PROCESS, RIGHT TO COMMENCE AN ACTION IN CIRCUIT COURT OR OTHER APPROPRIATE COURT OF COMPETENT JURISDICTION, AND ORDER OF ADMINISTRATIVE CLOSURE

For Complainant

Robert J. Tomel, Jr.
Johnston, Tomel,
Lenczycki & Goldberg, LLC
350 N. Milwaukee Ave.
Suite 202
Libertyville, IL 60048

For Respondent

Chief Executive Officer
Horizon Therapeutics USA, Inc.
1 Horizon Way
Deerfield, IL 60015

Date Perfected Charge Filed: Oct 22, 2021      Date Opt Out Request Filed: Oct 22, 2021

YOU ARE HEREBY NOTIFIED that pursuant to Section 7A-102(C-1) of the Illinois Human Rights Act (775 ILCS 5/7A-102(C-1)), Complainant having filed a written request to opt out of the Illinois Department of Human Rights' investigation and administrative processing of the above-captioned charge, the IDHR issues this Notice of Opt Out of the Investigative and Administrative Process, and the Right of Complainant to Commence an Action in the Circuit Court or other appropriate court of competent jurisdiction within 95 days from the date of this Notice and Order, as identified above.

- Complaint filed and serve a copy of the complaint to the Department and Respondent on the same date that the complaint is filed with the circuit court or other appropriate court of competent jurisdiction.
- Complainant may not file or refile a substantially similar charge with the Department arising from the same incident of unlawful discrimination or harassment.

NOW, THEREFORE, it is further hereby ORDERED that the Department cease the investigation and administratively close the charge of civil rights violation(s).

ENTERED ON November 4, 2021

                          DEPARTMENT OF HUMAN RIGHTS

                          BY: _____
                                 Brent A. Harzman, Director
                                 Charge Processing Division

Notice of Opt Out, Right & Order Adm.
Closure D/P 01/01/2020

Exhibit 4

# Exhibit A

# EXHIBIT 6

Exhibit A

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Noel Stuertz
c/o Robert J. Tomei, Jr.
Johnston, Tomei, Lenczycki & Goldberg, LLC
350 N. Milwaukee Avenue, Suite 202
Libertyville, IL 60048

From: Chicago District Office
230 S. Dearborn
Suite 1866
Chicago, IL 60604

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 21B-2022-00075 | Daniel Lim, State & Local Coordinator | (312) 872-9669 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X] Other (briefly state)    Opted Out to File Suit in Court

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Julianne Bowman*/jwa

11/4/2021

Enclosures(s)

Julianne Bowman,
District Director

(Date Issued)

cc:

HORIZON THERAPEUTICS USA, INC.
c/o Chief Executive Officer
1 Horizon Way
Deerfield, IL 60015

Exhibit 6

# Exhibit A

# EXHIBIT 7

Exhibit A

 **U.S. FOOD & DRUG**
ADMINISTRATION

Our STN: BL 125742/0

**BLA APPROVAL**

BioNTech Manufacturing GmbH
Attention: Amit Patel
Pfizer Inc.
235 East 42nd Street
New York, NY 10017

August 23, 2021

Dear Mr. Patel:

Please refer to your Biologics License Application (BLA) submitted and received on May 18, 2021, under section 351(a) of the Public Health Service Act (PHS Act) for COVID-19 Vaccine, mRNA.

**LICENSING**

We are issuing Department of Health and Human Services U.S. License No. 2229 to BioNTech Manufacturing GmbH, Mainz, Germany, under the provisions of section 351(a) of the PHS Act controlling the manufacture and sale of biological products. The license authorizes you to introduce or deliver for introduction into interstate commerce, those products for which your company has demonstrated compliance with establishment and product standards.

Under this license, you are authorized to manufacture the product, COVID-19 Vaccine, mRNA, which is indicated for active immunization to prevent coronavirus disease 2019 (COVID-19) caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

The review of this product was associated with the following National Clinical Trial (NCT) numbers: NCT04368728 and NCT04380701.

**MANUFACTURING LOCATIONS**

Under this license, you are approved to manufacture COVID-19 Vaccine, mRNA drug substance at Wyeth BioPharma Division of Wyeth Pharmaceuticals LLC, 1 Burtt Road, Andover, Massachusetts. The final formulated product will be manufactured, filled, labeled and packaged at Pfizer Manufacturing Belgium NV, Rijksweg 12, Puurs, Belgium and at Pharmacia & Upjohn Company LLC, 7000 Portage Road, Kalamazoo, Michigan. The diluent, 0.9% Sodium Chloride Injection, USP, will be manufactured at Hospira, Inc., (b) (4) and at Fresenius Kabi USA, LLC, (b) (4) .

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

Exhibit 7

# Exhibit A

Page 2 – STN BL 125742/0 – Elisa Harkins

You may label your product with the proprietary name, COMIRNATY, and market it in 2.0 mL glass vials, in packages of 25 and 195 vials.

We did not refer your application to the Vaccines and Related Biological Products Advisory Committee because our review of information submitted in your BLA, including the clinical study design and trial results, did not raise concerns or controversial issues that would have benefited from an advisory committee discussion.

DATING PERIOD

The dating period for COVID-19 Vaccine, mRNA shall be 9 months from the date of manufacture when stored between –90°C to –60°C (–130°F to –76°F). The date of manufacture shall be no later than the date of final sterile filtration of the formulated drug product (at Pharmacia & Upjohn Company LLC in Kalamazoo, Michigan, the date of manufacture is defined as the date of sterile filtration for the final drug product; at Pfizer Manufacturing Belgium NV in Puurs, Belgium, it is defined as the date of the (b) (4)

Following the final sterile filtration, (b) (4) , no reprocessing/reworking is allowed without prior approval from the Agency. The dating period for your drug substance shall be (b) (4) when stored at (b) (4) We have approved the stability protocols in your license application for the purpose of extending the expiration dating period of your drug substance and drug product under 21 CFR 601.12.

FDA LOT RELEASE

Please submit final container samples of the product in final containers together with protocols showing results of all applicable tests. You may not distribute any lots of product until you receive a notification of release from the Director, Center for Biologics Evaluation and Research (CBER).

BIOLOGICAL PRODUCT DEVIATIONS

You must submit reports of biological product deviations under 21 CFR 600.14. You should identify and investigate all manufacturing deviations promptly, including those associated with processing, testing, packaging, labeling, storage, holding and distribution. If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, you must submit a report on Form FDA 3486 to the Director, Office of Compliance and Biologics Quality, electronically through the eBPDR web application or at the address below. Links for the instructions on completing the electronic form (eBPDR) may be found on CBER's web site at https://www.fda.gov/vaccines-blood-biologics/report-problem-center-biologics-evaluation-research/biological-product-deviations:

    Food and Drug Administration
    Center for Biologics Evaluation and Research
    Document Control Center

Exhibit 7

Exhibit A

Page 3 – STN BL 125742/0 – Elisa Harkins

>10903 New Hampshire Ave.
>WO71-G112
>Silver Spring, MD 20993-0002

MANUFACTURING CHANGES

You must submit information to your BLA for our review and written approval under 21 CFR 601.12 for any changes in, including but not limited to, the manufacturing, testing, packaging or labeling of COVID-19 Vaccine, mRNA, or in the manufacturing facilities.

LABELING

We hereby approve the draft content of labeling including Package Insert, submitted under amendment 74, dated August 21, 2021, and the draft carton and container labels submitted under amendment 63, dated August 19, 2021.

CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, please submit the final content of labeling (21 CFR 601.14) in Structured Product Labeling (SPL) format via the FDA automated drug registration and listing system, (eLIST) as described at http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm. Content of labeling must be identical to the Package Insert submitted on August 21, 2021. Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As* at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM072392.pdf.

The SPL will be accessible via publicly available labeling repositories.

CARTON AND CONTAINER LABELS

Please electronically submit final printed carton and container labels identical to the carton and container labels submitted on August 19, 2021, according to the guidance for industry *Providing Regulatory Submissions in Electronic Format — Certain Human Pharmaceutical Product Applications and Related Submissions Using the eCTD Specifications* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-regulatory-submissions-electronic-format-certain-human-pharmaceutical-product-applications.

All final labeling should be submitted as Product Correspondence to this BLA STN BL 125742 at the time of use and include implementation information on Form FDA 356h.

ADVERTISING AND PROMOTIONAL LABELING

Exhibit 7

Exhibit A

Page 4 – STN BL 125742/0 – Elisa Harkins

You may submit two draft copies of the proposed introductory advertising and promotional labeling with Form FDA 2253 to the Advertising and Promotional Labeling Branch at the following address:

Food and Drug Administration
Center for Biologics Evaluation and Research
Document Control Center
10903 New Hampshire Ave.
WO71-G112
Silver Spring, MD 20993-0002

You must submit copies of your final advertising and promotional labeling at the time of initial dissemination or publication, accompanied by Form FDA 2253 (21 CFR 601.12(f)(4)).

All promotional claims must be consistent with and not contrary to approved labeling. You should not make a comparative promotional claim or claim of superiority over other products unless you have substantial evidence or substantial clinical experience to support such claims (21 CFR 202.1(e)(6)).

ADVERSE EVENT REPORTING

You must submit adverse experience reports in accordance with the adverse experience reporting requirements for licensed biological products (21 CFR 600.80), and you must submit distribution reports at monthly intervals as described in 21 CFR 600.81. For information on adverse experience reporting, please refer to the guidance for industry *Providing Submissions in Electronic Format —Postmarketing Safety Reports for Vaccines* at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/providing-submissions-electronic-format-postmarketing-safety-reports-vaccines. For information on distribution reporting, please refer to the guidance for industry *Electronic Submission of Lot Distribution Reports* at http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Post-MarketActivities/LotReleases/ucm061966.htm.

PEDIATRIC REQUIREMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are deferring submission of your pediatric studies for ages younger than 16 years for this application because this product is ready for approval for use in individuals 16 years of age and older, and the pediatric studies for younger ages have not been completed.

Exhibit 7

Exhibit A

Page 5 – STN BL 125742/0 – Elisa Harkins

Your deferred pediatric studies required under section 505B(a) of the Federal Food, Drug, and Cosmetic Act (FDCA) are required postmarketing studies. The status of these postmarketing studies must be reported according to 21 CFR 601.28 and section 505B(a)(4)(C) of the FDCA. In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

Label your annual report as an "**Annual Status Report of Postmarketing Study Requirement/Commitments**" and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements under section 506B of the FDCA are released or fulfilled. These required studies are listed below:

1.  Deferred pediatric Study C4591001 to evaluate the safety and effectiveness of COMIRNATY in children 12 years through 15 years of age.

    Final Protocol Submission: October 7, 2020

    Study Completion: May 31, 2023

    Final Report Submission: October 31, 2023

2.  Deferred pediatric Study C4591007 to evaluate the safety and effectiveness of COMIRNATY in infants and children 6 months to <12 years of age.

    Final Protocol Submission: February 8, 2021

    Study Completion: November 30, 2023

    Final Report Submission: May 31, 2024

3.  Deferred pediatric Study C4591023 to evaluate the safety and effectiveness of COMIRNATY in infants <6 months of age.

    Final Protocol Submission: January 31, 2022

    Study Completion: July 31, 2024

    Final Report Submission: October 31, 2024

Submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND. Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.
Submit final study reports to this BLA STN BL 125742. In order for your PREA PMRs to be considered fulfilled, you must submit and receive approval of an efficacy or a labeling

Exhibit 7

Exhibit A

Page 6 – STN BL 125742/0 – Elisa Harkins

supplement. For administrative purposes, all submissions related to these required pediatric postmarketing studies must be clearly designated as:

- **Required Pediatric Assessment(s)**

We note that you have fulfilled the pediatric study requirement for ages 16 through 17 years for this application.

POSTMARKETING REQUIREMENTS UNDER SECTION 505(o)

Section 505(o) of the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute (section 505(o)(3)(A), 21 U.S.C. 355(o)(3)(A)).

We have determined that an analysis of spontaneous postmarketing adverse events reported under section 505(k)(1) of the FDCA will not be sufficient to assess known serious risks of myocarditis and pericarditis and identify an unexpected serious risk of subclinical myocarditis.

Furthermore, the pharmacovigilance system that FDA is required to maintain under section 505(k)(3) of the FDCA is not sufficient to assess these serious risks.

Therefore, based on appropriate scientific data, we have determined that you are required to conduct the following studies:

4. Study C4591009, entitled "A Non-Interventional Post-Approval Safety Study of the Pfizer-BioNTech COVID-19 mRNA Vaccine in the United States," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

   We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

   Final Protocol Submission: August 31, 2021

   Monitoring Report Submission: October 31, 2022

   Interim Report Submission: October 31, 2023

   Study Completion: June 30, 2025

   Final Report Submission: October 31, 2025

5. Study C4591021, entitled "Post Conditional Approval Active Surveillance Study Among Individuals in Europe Receiving the Pfizer-BioNTech Coronavirus

Exhibit 7

Exhibit A

Page 7 – STN BL 125742/0 – Elisa Harkins

Disease 2019 (COVID-19) Vaccine," to evaluate the occurrence of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission: August 11, 2021

Progress Report Submission: September 30, 2021

Interim Report 1 Submission: March 31, 2022

Interim Report 2 Submission: September 30, 2022

Interim Report 3 Submission: March 31, 2023

Interim Report 4 Submission: September 30, 2023

Interim Report 5 Submission: March 31, 2024

Study Completion: March 31, 2024

Final Report Submission: September 30, 2024

6. Study C4591021 substudy to describe the natural history of myocarditis and pericarditis following administration of COMIRNATY.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission: January 31, 2022

Study Completion: March 31, 2024

Final Report Submission: September 30, 2024

7. Study C4591036, a prospective cohort study with at least 5 years of follow-up for potential long-term sequelae of myocarditis after vaccination (in collaboration with Pediatric Heart Network).

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission: November 30, 2021

Study Completion: December 31, 2026

Exhibit 7

Exhibit A

Page 8 – STN BL 125742/0 – Elisa Harkins

Final Report Submission: May 31, 2027

8. Study C4591007 substudy to prospectively assess the incidence of subclinical myocarditis following administration of the second dose of COMIRNATY in a subset of participants 5 through 15 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this assessment according to the following schedule:

Final Protocol Submission: September 30, 2021

Study Completion: November 30, 2023

Final Report Submission: May 31, 2024

9. Study C4591031 substudy to prospectively assess the incidence of subclinical myocarditis following administration of a third dose of COMIRNATY in a subset of participants 16 to 30 years of age.

We acknowledge the timetable you submitted on August 21, 2021, which states that you will conduct this study according to the following schedule:

Final Protocol Submission: November 30, 2021

Study Completion: June 30, 2022

Final Report Submission: December 31, 2022

Please submit the protocols to your IND 19736, with a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND. Please refer to the PMR sequential number for each study/clinical trial and the submission number as shown in this letter.

Please submit final study reports to the BLA. If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement to this BLA STN BL 125742. For administrative purposes, all submissions related to these postmarketing studies required under section 505(o) must be submitted to this BLA and be clearly designated as:

- **Required Postmarketing Correspondence under Section 505(o)**
- **Required Postmarketing Final Report under Section 505(o)**
- **Supplement contains Required Postmarketing Final Report under Section 505(o)**

Section 505(o)(3)(E)(ii) of the FDCA requires you to report periodically on the status of any study or clinical trial required under this section. This section also requires you to periodically report to FDA on the status of any study or clinical trial otherwise

Exhibit 7

Exhibit A

Page 9 – STN BL 125742/0 – Elisa Harkins

undertaken to investigate a safety issue. In addition, section 506B of the FDCA and 21 CFR 601.70 require you to report annually on the status of any postmarketing commitments or required studies or clinical trials.

You must describe the status in an annual report on postmarketing studies for this product. Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released. The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing requirement;
- the original milestone schedule for the requirement;
- the revised milestone schedule for the requirement, if appropriate;
- the current status of the requirement (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status for the study or clinical trial. The explanation should include how the study is progressing in reference to the original projected schedule, including, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

We will consider the submission of your annual report under section 506B of the FDCA and 21 CFR 601.70 to satisfy the periodic reporting requirement under section 505(o)(3)(E)(ii) provided that you include the elements listed in section 505(o) and 21 CFR 601.70. We remind you that to comply with section 505(o), your annual report must also include a report on the status of any study or clinical trial otherwise undertaken to investigate a safety issue. Failure to periodically report on the status of studies or clinical trials required under section 505(o) may be a violation of FDCA section 505(o)(3)(E)(ii) and could result in regulatory action.

**POSTMARKETING COMMITMENTS SUBJECT TO REPORTING REQUIREMENTS UNDER SECTION 506B**

We acknowledge your written commitments as described in your letter of August 21, 2021 as outlined below:

10. Study C4591022, entitled "Pfizer-BioNTech COVID-19 Vaccine Exposure during Pregnancy: A Non-Interventional Post-Approval Safety Study of Pregnancy and Infant Outcomes in the Organization of Teratology Information Specialists (OTIS)/MotherToBaby Pregnancy Registry."

Final Protocol Submission: July 1, 2021

Exhibit 7

Exhibit A

Page 10 – STN BL 125742/0 – Elisa Harkins

Study Completion: June 30, 2025

Final Report Submission: December 31, 2025

11. Study C4591007 substudy to evaluate the immunogenicity and safety of lower dose levels of COMIRNATY in individuals 12 through <30 years of age.

Final Protocol Submission: September 30, 2021

Study Completion: November 30, 2023

Final Report Submission: May 31, 2024

12. Study C4591012, entitled "Post-emergency Use Authorization Active Safety Surveillance Study Among Individuals in the Veteran's Affairs Health System Receiving Pfizer-BioNTech Coronavirus Disease 2019 (COVID-19) Vaccine."

Final Protocol Submission: January 29, 2021

Study Completion: June 30, 2023

Final Report Submission: December 31, 2023

13. Study C4591014, entitled "Pfizer-BioNTech COVID-19 BNT162b2 Vaccine Effectiveness Study - Kaiser Permanente Southern California."

Final Protocol Submission: March 22, 2021

Study Completion: December 31, 2022

Final Report Submission: June 30, 2023

Please submit clinical protocols to your IND 19736, and a cross-reference letter to this BLA STN BL 125742 explaining that these protocols were submitted to the IND. Please refer to the PMC sequential number for each study/clinical trial and the submission number as shown in this letter.

If the information in the final study report supports a change in the label, the final study report must be submitted as a supplement. Please use the following designators to prominently label all submissions, including supplements, relating to these postmarketing study commitments as appropriate:

- Postmarketing Commitment – Correspondence Study Update
- Postmarketing Commitment – Final Study Report
- Supplement contains Postmarketing Commitment – Final Study Report

Exhibit 7

Exhibit A

Page 11 – STN BL 125742/0 – Elisa Harkins

For each postmarketing study subject to the reporting requirements of 21 CFR 601.70, you must describe the status in an annual report on postmarketing studies for this product. Label your annual report as an **Annual Status Report of Postmarketing Requirements/Commitments** and submit it to the FDA each year within 60 calendar days of the anniversary date of this letter until all Requirements and Commitments subject to the reporting requirements of section 506B of the FDCA are fulfilled or released. The status report for each study should include:

- the sequential number for each study as shown in this letter;
- information to identify and describe the postmarketing commitment;
- the original schedule for the commitment;
- the status of the commitment (i.e., pending, ongoing, delayed, terminated, or submitted); and,
- an explanation of the status including, for clinical studies, the patient accrual rate (i.e., number enrolled to date and the total planned enrollment).

As described in 21 CFR 601.70(e), we may publicly disclose information regarding these postmarketing studies on our website at http://www.fda.gov/Drugs/Guidance ComplianceRegulatoryInformation/Post-marketingPhaseIVCommitments/default.htm.

POST APPROVAL FEEDBACK MEETING

New biological products qualify for a post approval feedback meeting. Such meetings are used to discuss the quality of the application and to evaluate the communication process during drug development and marketing application review. The purpose is to learn from successful aspects of the review process and to identify areas that could benefit from improvement. If you would like to have such a meeting with us, please contact the Regulatory Project Manager for this application.

Sincerely,

Mary A. Malarkey
Director
Office of Compliance
  and Biologics Quality
Center for Biologics
  Evaluation and Research

Marion F. Gruber, PhD
Director
Office of Vaccines
  Research and Review
Center for Biologics
  Evaluation and Research

Exhibit 7

Exhibit A

# EXHIBIT 8

Exhibit A



September 22, 2021

Pfizer Inc.
Attention: Mr. Amit Patel
235 East 42nd St
New York, NY 10017

Dear Mr. Patel:

On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Federal Food, Drug, and Cosmetic
Act (the FD&C Act or the Act), the Secretary of the Department of Health and Human Services
(HHS) determined that there is a public health emergency that has a significant potential to affect
national security or the health and security of United States citizens living abroad, and that
involves the virus that causes Coronavirus Disease 2019 (COVID-19).[1] On the basis of such
determination, the Secretary of HHS on March 27, 2020, declared that circumstances exist
justifying the authorization of emergency use of drugs and biological products during the
COVID-19 pandemic, pursuant to Section 564 of the Act (21 U.S.C. 360bbb-3), subject to terms
of any authorization issued under that section.[2]

On December 11, 2020, the Food and Drug Administration (FDA) issued an Emergency Use
Authorization (EUA) for emergency use of Pfizer-BioNTech COVID-19 Vaccine for the
prevention of COVID-19 for individuals 16 years of age and older pursuant to Section 564 of the
Act. FDA reissued the letter of authorization on: December 23, 2020,[3] February 25, 2021,[4] May

---

[1] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that
Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the FD&C Act, 21 U.S.C. § 360bbb-3,
February 4, 2020.

[2] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations
Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 18250
(April 1, 2020).

[3] In the December 23, 2020 revision, FDA removed reference to the number of doses per vial after dilution from the
letter of authorization, clarified the instructions for vaccination providers reporting to VAERS, and made other
technical corrections. FDA also revised the Fact Sheet for Healthcare Providers Administering Vaccine
(Vaccination Providers) to clarify the number of doses of vaccine per vial after dilution and the instructions for
reporting to VAERS. In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination
Providers) and the Fact Sheet for Recipients and Caregivers were revised to include additional information on safety
monitoring and to clarify information about the availability of other COVID-19 vaccines.

[4] In the February 25, 2021 revision, FDA allowed flexibility on the date of submission of monthly periodic safety
reports and revised the requirements for reporting of vaccine administration errors by Pfizer Inc. The Fact Sheet for
Health Care Providers Administering Vaccine (Vaccination Providers) was revised to provide an update to the
storage and transportation temperature for frozen vials, direct the provider to the correct CDC website for
information on monitoring vaccine recipients for the occurrence of immediate adverse reactions, to include data
from a developmental toxicity study, and add adverse reactions that have been identified during post authorization
use. The Fact Sheet for Recipients and Caregivers was revised to add adverse reactions that have been identified
during post authorization use.

Exhibit 8

Exhibit A

Page 2 – Pfizer Inc.

10, 2021,[5] June 25, 2021,[6] August 12, 2021,[7] and on August 23, 2021, FDA approved COMIRNATY (COVID-19 Vaccine, mRNA)[8] and reissued the letter in its entirety for both Pfizer-BioNTech COVID-19 Vaccine and certain uses of COMIRNATY (COVID-19 Vaccine, mRNA).[9]

On September, 22 2021, having concluded that revising this EUA is appropriate to protect the public health or safety under section 564(g)(2) of the Act, FDA is reissuing the August 23, 2021 letter of authorization in its entirety with revisions incorporated to authorize for emergency use the administration of a single booster dose of COMIRNATY (COVID-19 Vaccine, mRNA) or Pfizer-BioNTech COVID-19 Vaccine at least 6 months after completing the primary series of this vaccine in individuals: 65 years of age and older;18 through 64 years of age at high risk of severe COVID-19; and 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19.

---

[5] In the May 10, 2021 revision, FDA authorized Pfizer-BioNTech Vaccine for the prevention of COVID-19 in individuals 12 through 15 years of age, as well as for individuals 16 years of age and older. In addition, FDA revised the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) to include the following Warning: "Syncope (fainting) may occur in association with administration of injectable vaccines, in particular in adolescents. Procedures should be in place to avoid injury from fainting." In addition, the Fact Sheet for Recipients and Caregivers was revised to instruct vaccine recipients or their caregivers to tell the vaccination provider about fainting in association with a previous injection.

[6] In the June 25, 2021 revision, FDA clarified terms and conditions that relate to export of Pfizer-BioNTech COVID-19 Vaccine from the United States. In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to include a Warning about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine. The Fact Sheet for Recipients and Caregivers was updated to include information about myocarditis and pericarditis following administration of the Pfizer-BioNTech COVID-19 Vaccine.

[7] In the August 12, 2021 revision, FDA authorized a third dose of the Pfizer-BioNTech COVID-19 Vaccine administered at least 28 days following the two dose regimen of this vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

[8] COMIRNATY (COVID-19 Vaccine, mRNA) was approved for active immunization to prevent COVID-19 caused by severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) in individuals 16 years of age and older.

[9] In the August 23, 2021 revision, FDA clarified that, subsequent to the FDA approval of COMIRNATY (COVID-19 Vaccine, mRNA) for the prevention of COVID-19 for individuals 16 years of age and older, this EUA would remain in place for the Pfizer-BioNTech COVID-19 vaccine for the previously-authorized indication and uses. It also authorized COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA for certain uses that are not included in the approved biologics license application (BLA). In addition, the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) was revised to provide updates on expiration dating of the authorized Pfizer-BioNTech COVID-19 Vaccine and updated language regarding warnings and precautions related to myocarditis and pericarditis. The Fact Sheet for Recipients and Caregivers was updated as the Vaccine Information Fact Sheet for Recipients and Caregivers, which comprises the Fact Sheet for the authorized Pfizer-BioNTech COVID-19 Vaccine and information about the FDA-licensed vaccine, COMIRNATY (COVID-19 Vaccine, mRNA).

Exhibit 8

Exhibit A

Page 3 – Pfizer Inc.

COMIRNATY (COVID-19 Vaccine, mRNA) is the same formulation as the Pfizer-BioNTech COVID-19 Vaccine and can be used interchangeably with the Pfizer-BioNTech COVID-19 Vaccine to provide the COVID-19 vaccination series.[10]

For the December 11, 2020 authorization for individuals 16 years of age and older, FDA reviewed safety and efficacy data from an ongoing Phase 1/2/3 trial in approximately 44,000 participants randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control. The trial has enrolled participants 12 years of age and older. FDA's review at that time considered the safety and effectiveness data as they relate to the request for emergency use authorization in individuals 16 years of age and older. FDA's review of the available safety data from 37,586 of the participants 16 years of age and older, who were followed for a median of two months after receiving the second dose, did not identify specific safety concerns that would preclude issuance of an EUA. FDA's analysis of the available efficacy data from 36,523 participants 12 years of age and older without evidence of SARS-CoV-2 infection prior to 7 days after dose 2 confirmed that the vaccine was 95% effective (95% credible interval 90.3, 97.6) in preventing COVID-19 occurring at least 7 days after the second dose (with 8 COVID-19 cases in the vaccine group compared to 162 COVID-19 cases in the placebo group). Based on these data, and review of manufacturing information regarding product quality and consistency, FDA concluded that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective. Additionally, FDA determined it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 16 years of age and older.  Finally, on December 10, 2020, the Vaccines and Related Biological Products Advisory Committee voted in agreement with this conclusion.

For the May 10, 2021 authorization for individuals 12 through 15 years of age, FDA reviewed safety and effectiveness data from the above-referenced, ongoing Phase 1/2/3 trial that has enrolled approximately 46,000 participants, including 2,260 participants 12 through 15 years of age. Trial participants were randomized 1:1 to receive Pfizer-BioNTech COVID-19 Vaccine or saline control. FDA's review of the available safety data from 2,260 participants 12 through 15 years of age, who were followed for a median of 2 months after receiving the second dose, did not identify specific safety concerns that would preclude issuance of an EUA. FDA's analysis of SARS-CoV-2 50% neutralizing antibody titers 1 month after the second dose of Pfizer-BioNTech COVID-19 Vaccine in a subset of participants who had no serological or virological evidence of past SARS-CoV-2 infection confirm that the geometric mean antibody titer in participants 12 through 15 years of age was non-inferior to the geometric mean antibody titer in participants 16 through 25 years of age. FDA's analysis of available descriptive efficacy data from 1,983 participants 12 through 15 years of age without evidence of SARS-CoV-2 infection prior to 7 days after dose 2 confirm that the vaccine was 100% effective (95% confidence interval 75.3, 100.0) in preventing COVID-19 occurring at least 7 days after the second dose

---

[10] The licensed vaccine has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

Exhibit 8

**Exhibit A**

Page 4 – Pfizer Inc.

(with no COVID-19 cases in the vaccine group compared to 16 COVID-19 cases in the placebo group). Based on these data, FDA concluded that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in individuals 12 through 15 years of age. Additionally, FDA determined it is reasonable to conclude, based on the totality of the scientific evidence available, that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine, for the prevention of COVID-19 in individuals 12 through 15 years of age.

For the August 12, 2021 authorization of a third dose of the Pfizer-BioNTech COVID-19 Vaccine in individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise, FDA reviewed safety and effectiveness data reported in two manuscripts on solid organ transplant recipients. The first study was a single arm study conducted in 101 individuals who had undergone various solid organ transplant procedures (heart, kidney, liver, lung, pancreas) a median of $97\pm8$ months earlier. A third dose of the Pfizer-BioNTech COVID-19 Vaccine was administered to 99 of these individuals approximately 2 months after they had received a second dose. Levels of total SARS-CoV-2 binding antibodies meeting the pre-specified criteria for success occurred four weeks after the third dose in 26/59 (44.0%) of those who were initially considered to be seronegative and received a third dose of the Pfizer-BioNTech COVID-19 Vaccine; 67/99 (68%) of the entire group receiving a third vaccination were subsequently considered to have levels of antibodies indicative of a significant response. In those who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 events were reported. A supportive secondary study describes a double-blind, randomized-controlled study conducted in 120 individuals who had undergone various solid organ transplant procedures (heart, kidney, kidney-pancreas, liver, lung, pancreas) a median of 3.57 years earlier (range 1.99-6.75 years). A third dose of a similar mRNA vaccine (the Moderna COVID-19 vaccine) was administered to 60 individuals approximately 2 months after they had received a second dose (i.e., doses at 0, 1 and 3 months); saline placebo was given to 60 individuals for comparison. The primary outcome was anti-RBD antibody at 4 months greater than 100 U/mL. This titer was selected based on NHP challenge studies as well as a large clinical cohort study to indicate this antibody titer was protective. Secondary outcomes were based on a virus neutralization assay and polyfunctional T cell responses. Baseline characteristics were comparable between the two study arms as were pre-intervention anti-RBD titer and neutralizing antibodies. Levels of total SARS-CoV-2 binding antibodies indicative of a significant response occurred four weeks after the third dose in 33/60 (55.0%) of the Moderna COVID-19 vaccinated group and 10/57 (17.5%) of the placebo individuals. In the 60 individuals who received a third vaccine dose, the adverse event profile was similar to that after the second dose and no grade 3 or grade 4 adverse events were reported. Despite the moderate enhancement in antibody titers, the totality of data (i.e., supportive paper by Hall et al. demonstrated efficacy of the product in the elderly and persons with co-morbidities) supports the conclusion that a third dose of the Pfizer-BioNTech COVID-19 Vaccine may be effective in this population, and that the known and potential benefits of a third dose of Pfizer-BioNTech COVID-19 Vaccine outweigh the known and potential risks of the vaccine for immunocompromised individuals at least 12 years of age who have received two doses of the Pfizer-BioNTech COVID-19 Vaccine and who have undergone solid organ

Exhibit 8

Exhibit A

Page 5 – Pfizer Inc.

transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise.

For the September 22, 2021 authorization of a single booster dose of the Pfizer-BioNTech COVID-19 Vaccine administered at least 6 months after completing the primary series in individuals: 65 years of age and older; 18 through 64 years of age at high risk of severe COVID-19; and 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19, FDA reviewed safety and effectiveness data from the above-referenced, ongoing Phase 1/2/3 trial in which 329 participants 18 through 75 years of age received a booster dose of the Pfizer-BioNTech COVID-19 Vaccine approximately 6 months (range 4.8 to 8.8 months) after completion of the primary series. FDA's review of the available safety data from 329 participants 18 through 75 years of age, who had been followed for a median of 2.6 months after receiving the booster dose, did not identify specific safety concerns that would preclude issuance of an EUA. The effectiveness of the booster dose of the Pfizer-BioNTech COVID-19 Vaccine is based on an assessment of 50% neutralizing antibody titers (NT50) against SARS-CoV-2 (USA_WA1/2020). FDA's analysis of SARS-CoV-2 NT50 one month after the booster dose compared to 1 month after the primary series in study participants 18 through 55 years of age who had no serological or virological evidence of past SARS-CoV-2 infection up to 1 month after the booster dose confirmed noninferiority for both geometric mean ratio and difference in seroresponse rates. Based on the totality of the scientific evidence available, including data from the above-referenced clinical trial, FDA concluded that a booster dose the Pfizer-BioNTech COVID-19 Vaccine may be effective, and that the known and potential benefits of a single booster dose at least 6 months after completing the primary series outweigh the known and potential risks for individuals 65 years of age and older; individuals 18 through 64 years of age at high risk of severe COVID-19; and individuals 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of Pfizer-BioNTech COVID-19 Vaccine for the prevention of COVID-19, as described in the Scope of Authorization section of this letter (Section II) and subject to the terms of this authorization. Additionally, as specified in subsection III.BB, I am authorizing use of Pfizer-BioNTech COVID-19 Vaccine and of COMIRNATY (COVID-19 Vaccine, mRNA) under this EUA when used to provide: a two-dose regimen for individuals aged 12 through 15 years; a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise; or a single booster dose at least 6 months after completing the primary series to individuals: 65 years of age and older; 18 through 64 years of age at high risk of severe COVID-19; and 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19.

Exhibit 8

**Exhibit A**

Page 6 – Pfizer Inc.

## I.     Criteria for Issuance of Authorization

I have concluded that the emergency use of Pfizer-BioNTech COVID-19 Vaccine[11] for the prevention of COVID-19 when administered as described in the Scope of Authorization (Section II) meets the criteria for issuance of an authorization under Section 564(c) of the Act, because:

A. SARS-CoV-2 can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

B. Based on the totality of scientific evidence available to FDA, it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19, and that, when used under the conditions described in this authorization, the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine when used to prevent COVID-19 outweigh its known and potential risks; and

C. There is no adequate, approved, and available alternative[12] Pfizer-BioNTech COVID-19 Vaccine to prevent COVID-19.[13]

## II.     Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited as follows:

- Pfizer Inc. will supply Pfizer-BioNTech COVID-19 Vaccine either directly or through authorized distributor(s),[14] to emergency response stakeholders[15] as directed by the U.S.

---

[11] In this section (Section I), references to Pfizer-BioNTech COVID-19 Vaccine also apply to COMIRNATY (COVID-19 Vaccine, mRNA).

[12] Although COMIRNATY (COVID-19 Vaccine, mRNA) is approved to prevent COVID-19 in individuals 16 years of age and older, there is not sufficient approved vaccine available for distribution to this population in its entirety at the time of reissuance of this EUA. Additionally, there are no products that are approved to prevent COVID-19 in individuals age 12 through 15, or to provide: an additional dose to the immunocompromised population, or a booster dose to the authorized population described in this EUA.

[13] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[14] "Authorized Distributor(s)" are identified by Pfizer Inc. or, if applicable, by a U.S. government entity, such as the Centers for Disease Control and Prevention (CDC) and/or other designee, as an entity or entities allowed to distribute authorized Pfizer-BioNTech COVID-19 Vaccine.

[15] For purposes of this letter, "emergency response stakeholder" refers to a public health agency and its delegates that have legal responsibility and authority for responding to an incident, based on political or geographical boundary lines (e.g., city, county, tribal, territorial, State, or Federal), or functional (e.g., law enforcement or public health range) or sphere of authority to administer, deliver, or distribute vaccine in an emergency situation. In some cases (e.g., depending on a state or local jurisdiction's COVID-19 vaccination response organization and plans), there might be overlapping roles and responsibilities among "emergency response stakeholders" and "vaccination providers" (e.g., if a local health department is administering COVID-19 vaccines; if a pharmacy is acting in an official capacity under the authority of the state health department to administer COVID-19 vaccines). In such cases, it is expected that the conditions of authorization that apply to emergency response stakeholders and vaccination providers will all be met.

Exhibit 8

Exhibit A

Page 7 – Pfizer Inc.

government, including the Centers for Disease Control and Prevention (CDC) and/or other designee, for use consistent with the terms and conditions of this EUA;

• The Pfizer-BioNTech COVID-19 Vaccine covered by this authorization will be administered by vaccination providers[16] and used only to prevent COVID-19 in individuals ages 12 and older with a two-dose regimen, to provide a third dose to individuals 12 years of age or older who have undergone solid organ transplantation, or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise, and to provide a single booster dose at least 6 months after completing the primary series of the vaccine to individuals: 65 years of age or older; 18 through 64 years of age at high risk of severe COVID-19; and 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19; and

• Pfizer-BioNTech COVID-19 Vaccine may be administered by a vaccination provider without an individual prescription for each vaccine recipient.

This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide: a two-dose regimen for individuals aged 12 through 15 years; a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise; or a single booster dose at least 6 months after completing the primary series to individuals: 65 years of age and older; 18 through 64 years of age at high risk of severe COVID-19; and 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19.

## Product Description[17]

The Pfizer-BioNTech COVID-19 Vaccine is supplied as a frozen suspension in multiple dose vials; each vial must be diluted with 1.8 mL of sterile 0.9% Sodium Chloride Injection, USP prior to use to form the vaccine. The Pfizer-BioNTech COVID-19 Vaccine does not contain a preservative.

---

[16] For purposes of this letter, "vaccination provider" refers to the facility, organization, or healthcare provider licensed or otherwise authorized by the emergency response stakeholder (e.g., non-physician healthcare professionals, such as nurses and pharmacists pursuant to state law under a standing order issued by the state health officer) to administer or provide vaccination services in accordance with the applicable emergency response stakeholder's official COVID-19 vaccination and emergency response plan(s) and who is enrolled in the CDC COVID-19 Vaccination Program. If the vaccine is exported from the United States, a "vaccination provider" is a provider that is authorized to administer this vaccine in accordance with the laws of the country in which it is administered. For purposes of this letter, "healthcare provider" also refers to a person authorized by the U.S. Department of Health and Human Services (e.g., under the PREP Act Declaration for Medical Countermeasures against COVID-19) to administer FDA-authorized COVID-19 vaccine (e.g., qualified pharmacy technicians and State-authorized pharmacy interns acting under the supervision of a qualified pharmacist). See, e.g., HHS. *Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration.* 85 FR 79190 (December 9, 2020).

[17] For COMIRNATY (COVID-19 Vaccine, mRNA) product description, please see the COMIRNATY (COVID-19 Vaccine, mRNA) prescribing information, found here: https://www.fda.gov/media/151707/download.

Exhibit 8

**Exhibit A**

Page 8 – Pfizer Inc.

Each 0.3 mL dose of the Pfizer-BioNTech COVID-19 Vaccine contains 30 mcg of a nucleoside-modified messenger RNA (modRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2. Each dose of the Pfizer-BioNTech COVID-19 Vaccine also includes the following ingredients: lipids (0.43 mg (4-hydroxybutyl)azanediyl)bis(hexane-6,1-diyl)bis(2-hexyldecanoate), 0.05 mg 2[(polyethylene glycol)-2000]-N,N-ditetradecylacetamide, 0.09 mg 1,2-distearoyl-sn-glycero-3-phosphocholine, and 0.2 mg cholesterol), 0.01 mg potassium chloride, 0.01 mg monobasic potassium phosphate, 0.36 mg sodium chloride, 0.07 mg dibasic sodium phosphate dihydrate, and 6 mg sucrose. The diluent (0.9% Sodium Chloride Injection) contributes an additional 2.16 mg sodium chloride per dose.

The dosing regimen is a primary series of two doses of 0.3 mL each, 3 weeks apart. A third primary series dose may be administered at least 28 days following the second dose to individuals 12 years of age or older who have undergone solid organ transplantation, or individuals 12 years of age or older who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise. A single booster dose (0.3 mL) may be administered at least 6 months after completing the primary series to individuals: 65 years of age or older; 18 through 64 years of age at high risk of severe COVID-19; and 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19.

The manufacture of the authorized Pfizer-BioNTech COVID-19 Vaccine is limited to those facilities identified and agreed upon in Pfizer's request for authorization.

The Pfizer-BioNTech COVID-19 Vaccine vial label and carton labels are clearly marked for "Emergency Use Authorization." The Pfizer-BioNTech COVID-19 Vaccine is authorized to be distributed, stored, further redistributed, and administered by emergency response stakeholders when packaged in the authorized manufacturer packaging (i.e., vials and cartons), despite the fact that the vial and carton labels may not contain information that otherwise would be required under the FD&C Act.

Pfizer-BioNTech COVID-19 Vaccine is authorized for emergency use with the following product-specific information required to be made available to vaccination providers and recipients, respectively (referred to as "authorized labeling"):

- Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers): Emergency Use Authorization (EUA) of Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)

- Vaccine Information Fact Sheet for Recipients and Caregivers About COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease (COVID-19).

Exhibit 8

Exhibit A

Page 9 – Pfizer Inc.

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of Pfizer-BioNTech COVID-19 Vaccine,[18] when used to prevent COVID-19 and used in accordance with this Scope of Authorization (Section II), outweigh its known and potential risks.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that Pfizer-BioNTech COVID-19 Vaccine may be effective in preventing COVID-19 when used in accordance with this Scope of Authorization (Section II), pursuant to Section 564(c)(2)(A) of the Act.

Having reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I above, I have concluded that Pfizer-BioNTech COVID-19 Vaccine (as described in this Scope of Authorization (Section II)) meets the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of Pfizer-BioNTech COVID-19 Vaccine under this EUA must be consistent with, and may not exceed, the terms of the Authorization, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section III). Subject to the terms of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), Pfizer-BioNTech COVID-19 Vaccine is authorized to prevent COVID-19 in individuals 12 years of age and older as described in the Scope of Authorization (Section II) under this EUA, despite the fact that it does not meet certain requirements otherwise required by applicable federal law.

## III. Conditions of Authorization

Pursuant to Section 564 of the Act, I am establishing the following conditions on this authorization:

Pfizer Inc. and Authorized Distributor(s)

    A. Pfizer Inc. and authorized distributor(s) will ensure that the authorized Pfizer-BioNTech COVID-19 Vaccine is distributed, as directed by the U.S. government, including CDC and/or other designee, and the authorized labeling (i.e., Fact Sheets) will be made available to vaccination providers, recipients, and caregivers consistent with the terms of this letter.

    B. Pfizer Inc. and authorized distributor(s) will ensure that appropriate storage and cold chain is maintained until delivered to emergency response stakeholders' receipt sites.

    C. Pfizer Inc. will ensure that the terms of this EUA are made available to all relevant stakeholders (e.g., emergency response stakeholders, authorized distributors, and vaccination providers) involved in distributing or receiving authorized Pfizer-BioNTech COVID-19 Vaccine. Pfizer Inc. will provide to all relevant stakeholders a

---

[18] The conclusions supporting authorization stated in this Section (Section II) also apply to COMIRNATY (COVID-19 Vaccine, mRNA).

Exhibit 8

Exhibit A

Page 10 – Pfizer Inc.

copy of this letter of authorization and communicate any subsequent amendments that might be made to this letter of authorization and its authorized labeling.

D. Pfizer Inc. may develop and disseminate instructional and educational materials (e.g., video regarding vaccine handling, storage/cold-chain management, preparation, disposal) that are consistent with the authorized emergency use of the vaccine as described in the letter of authorization and authorized labeling, without FDA's review and concurrence, when necessary to meet public health needs during an emergency. Any instructional and educational materials that are inconsistent with the authorized labeling are prohibited.

E. Pfizer Inc. may request changes to this authorization, including to the authorized Fact Sheets for the vaccine. Any request for changes to this EUA must be submitted to Office of Vaccines Research and Review (OVRR)/Center for Biologics Evaluation and Research (CBER). Such changes require appropriate authorization prior to implementation.[19]

F. Pfizer Inc. will report to Vaccine Adverse Event Reporting System (VAERS):
   - Serious adverse events (irrespective of attribution to vaccination);
   - Cases of Multisystem Inflammatory Syndrome in children and adults; and
   - Cases of COVID-19 that result in hospitalization or death, that are reported to Pfizer Inc.
   These reports should be submitted to VAERS as soon as possible but no later than 15 calendar days from initial receipt of the information by Pfizer Inc.

G. Pfizer Inc. must submit to Investigational New Drug application (IND) number 19736 periodic safety reports at monthly intervals in accordance with a due date agreed upon with the Office of Biostatistics and Epidemiology (OBE)/CBER beginning after the first full calendar month after authorization. Each periodic safety report is required to contain descriptive information which includes:
   - A narrative summary and analysis of adverse events submitted during the reporting interval, including interval and cumulative counts by age groups, special populations (e.g., pregnant women), and adverse events of special interest;
   - A narrative summary and analysis of vaccine administration errors, whether or not associated with an adverse event, that were identified since the last reporting interval;
   - Newly identified safety concerns in the interval; and

---

[19] The following types of revisions may be authorized without reissuing this letter: (1) changes to the authorized labeling; (2) non-substantive editorial corrections to this letter; (3) new types of authorized labeling, including new fact sheets; (4) new carton/container labels; (5) expiration dating extensions; (6) changes to manufacturing processes, including tests or other authorized components of manufacturing; (7) new conditions of authorization to require data collection or study. For changes to the authorization, including the authorized labeling, of the type listed in (3), (6), or (7), review and concurrence is required from the Preparedness and Response Team (PREP)/Office of the Center Director (OD)/CBER and the Office of Counterterrorism and Emerging Threats (OCET)/Office of the Chief Scientist (OCS).

Exhibit 8

Exhibit A

Page 11 – Pfizer Inc.

- Actions taken since the last report because of adverse experiences (for example, changes made to Healthcare Providers Administering Vaccine (Vaccination Providers) Fact Sheet, changes made to studies or studies initiated).

H. No changes will be implemented to the description of the product, manufacturing process, facilities, or equipment without notification to and concurrence by FDA.

I. All manufacturing facilities will comply with Current Good Manufacturing Practice requirements.

J. Pfizer Inc. will submit to the EUA file Certificates of Analysis (CoA) for each drug product lot at least 48 hours prior to vaccine distribution. The CoA will include the established specifications and specific results for each quality control test performed on the final drug product lot.

K. Pfizer Inc. will submit to the EUA file quarterly manufacturing reports, starting in July 2021, that include a listing of all Drug Substance and Drug Product lots produced after issuance of this authorization. This report must include lot number, manufacturing site, date of manufacture, and lot disposition, including those lots that were quarantined for investigation or those lots that were rejected. Information on the reasons for lot quarantine or rejection must be included in the report.

L. Pfizer Inc. and authorized distributor(s) will maintain records regarding release of Pfizer-BioNTech COVID-19 Vaccine for distribution (i.e., lot numbers, quantity, release date).

M. Pfizer Inc. and authorized distributor(s) will make available to FDA upon request any records maintained in connection with this EUA.

N. Pfizer Inc. will conduct post-authorization observational studies to evaluate the association between Pfizer-BioNTech COVID-19 Vaccine and a pre-specified list of adverse events of special interest, including myocarditis and pericarditis, along with deaths and hospitalizations, and severe COVID-19. The study population should include individuals administered the authorized Pfizer-BioNTech COVID-19 Vaccine under this EUA in the general U.S. population (12 years of age and older), individuals that receive a booster dose, populations of interest such as healthcare workers, pregnant women, immunocompromised individuals, subpopulations with specific comorbidities. The studies should be conducted in large scale databases with an active comparator. Pfizer Inc. will provide protocols and status update reports to the IND 19736 with agreed-upon study designs and milestone dates.

Emergency Response Stakeholders

O. Emergency response stakeholders will identify vaccination sites to receive authorized Pfizer-BioNTech COVID-19 Vaccine and ensure its distribution and administration, consistent with the terms of this letter and CDC's COVID-19 Vaccination Program.

Exhibit 8

Exhibit A

Page 12 – Pfizer Inc.

P.  Emergency response stakeholders will ensure that vaccination providers within their jurisdictions are aware of this letter of authorization, and the terms herein and any subsequent amendments that might be made to the letter of authorization, instruct them about the means through which they are to obtain and administer the vaccine under the EUA, and ensure that the authorized labeling [i.e., Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers) and Vaccine Information Fact Sheet for Recipients and Caregivers] is made available to vaccination providers through appropriate means (e.g., e-mail, website).

Q.  Emergency response stakeholders receiving authorized Pfizer-BioNTech COVID-19 Vaccine will ensure that appropriate storage and cold chain is maintained.

<u>Vaccination Providers</u>

R.  Vaccination providers will administer the vaccine in accordance with the authorization and will participate and comply with the terms and training required by CDC's COVID-19 Vaccination Program.

S.  Vaccination providers will provide the Vaccine Information Fact Sheet for Recipients and Caregivers to each individual receiving vaccination and provide the necessary information for receiving their second dose and/or third dose.

T.  Vaccination providers administering the vaccine must report the following information associated with the administration of the vaccine of which they become aware to VAERS in accordance with the Fact Sheet for Healthcare Providers Administering Vaccine (Vaccination Providers):
- Vaccine administration errors whether or not associated with an adverse event
- Serious adverse events (irrespective of attribution to vaccination)
- Cases of Multisystem Inflammatory Syndrome in children and adults
- Cases of COVID-19 that result in hospitalization or death

Complete and submit reports to VAERS online at https://vaers.hhs.gov/reportevent.html. The VAERS reports should include the words "Pfizer-BioNTech COVID-19 Vaccine EUA" in the description section of the report. More information is available at vaers.hhs.gov or by calling 1-800-822-7967. To the extent feasible, report to Pfizer Inc. by contacting 1-800-438-1985 or by providing a copy of the VAERS form to Pfizer Inc.; Fax: 1-866-635-8337.

U.  Vaccination providers will conduct any follow-up requested by the U.S government, including CDC, FDA, or other designee, regarding adverse events to the extent feasible given the emergency circumstances.

V.  Vaccination providers will monitor and comply with CDC and/or emergency response stakeholder vaccine management requirements (e.g., requirements

Exhibit 8

Exhibit A

Page 13 – Pfizer Inc.

concerning obtaining, tracking, and handling vaccine) and with requirements concerning reporting of vaccine administration data to CDC.

W. Vaccination providers will ensure that any records associated with this EUA are maintained until notified by FDA. Such records will be made available to CDC, and FDA for inspection upon request.

Conditions Related to Printed Matter, Advertising, and Promotion

X. All descriptive printed matter, advertising, and promotional material, relating to the use of the Pfizer-BioNTech COVID-19 Vaccine shall be consistent with the authorized labeling, as well as the terms set forth in this EUA, and meet the requirements set forth in section 502(a) and (n) of the FD&C Act and FDA implementing regulations.

Y. All descriptive printed matter, advertising, and promotional material relating to the use of the Pfizer-BioNTech COVID-19 Vaccine clearly and conspicuously shall state that:
- This product has not been approved or licensed by FDA, but has been authorized for emergency use by FDA, under an EUA to prevent Coronavirus Disease 2019 (COVID-19) for use in individuals 12 years of age and older; and
- The emergency use of this product is only authorized for the duration of the declaration that circumstances exist justifying the authorization of emergency use of the medical product under Section 564(b)(1) of the FD&C Act unless the declaration is terminated or authorization revoked sooner.

Condition Related to Export

Z. If the Pfizer-BioNTech COVID-19 Vaccine is exported from the United States, conditions C, D, and O through Y do not apply, but export is permitted only if 1) the regulatory authorities of the country in which the vaccine will be used are fully informed that this vaccine is subject to an EUA and is not approved or licensed by FDA and 2) the intended use of the vaccine will comply in all respects with the laws of the country in which the product will be used. The requirement in this letter that the authorized labeling (i.e., Fact Sheets) be made available to vaccination providers, recipients, and caregivers in condition A will not apply if the authorized labeling (i.e., Fact Sheets) are made available to the regulatory authorities of the country in which the vaccine will be used.

Conditions With Respect to Use of Licensed Product

AA. COMIRNATY (COVID-19 Vaccine, mRNA) is now licensed for individuals 16 years of age and older. There remains, however, a significant amount of Pfizer-BioNTech COVID-19 Vaccine that was manufactured and labeled in accordance with this emergency use authorization. The authorization remains in place with respect to the Pfizer-BioNTech COVID-19 Vaccine.

Exhibit 8

Exhibit A

Page 14 – Pfizer Inc.

BB. This authorization also covers the use of the licensed COMIRNATY (COVID-19 Vaccine, mRNA) product when used to provide: a two-dose regimen for individuals aged 12 through 15 years; a third dose to individuals 12 years of age or older who have undergone solid organ transplantation or who are diagnosed with conditions that are considered to have an equivalent level of immunocompromise; or a single booster dose at least 6 months after completing the primary series to individuals: 65 years of age or older; 18 through 64 years of age at high risk of severe COVID-19; and 18 through 64 years of age whose frequent institutional or occupational exposure to SARS-CoV-2 puts them at high risk of serious complications of COVID-19 including severe COVID-19. Conditions A through W in this letter apply when COMIRNATY (COVID-19 Vaccine, mRNA) is provided for the uses described in this subsection III.BB, except that product manufactured and labeled in accordance with the approved BLA is deemed to satisfy the manufacturing, labeling, and distribution requirements of this authorization.

## IV. Duration of Authorization

This EUA will be effective until the declaration that circumstances exist justifying the authorization of the emergency use of drugs and biological products during the COVID-19 pandemic is terminated under Section 564(b)(2) of the Act or the EUA is revoked under Section 564(g) of the Act.

Sincerely,

--/S/--

_____
RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

Enclosures

Exhibit 8

# Exhibit A